Alfred L. STEWART, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 49S00–0010–CR–587.

Supreme Court of Indiana.

Aug. 29, 2001.

Ann Sutton, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, James B. Martin, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

BOEHM, Justice.

Alfred Stewart, a juvenile, was convicted of felony murder and robbery. In this direct appeal, Stewart contends that the trial court should have suppressed his confession to the police because it was taken in violation of Indiana Code section 31–32–5–1. We reverse the conviction and remand for a new trial.

**Factual and Procedural Background**

At some point on December 4, 1998, Damon Forte, Stewart's cousin, suggested that, because he and Stewart were out of cash, they should rob someone. The pair had been sitting at the Bigfoot Gas Station parking lot on East 38th Street for about four hours when Johnnie Smith and Ralph Moore arrived after dark to refuel Smith's car. As Moore slept in the car, Smith decided to make a call on an outdoor pay-phone near the lot. Stewart and Forte approached Smith. Smith struck up a conversation with the pair, but turned to walk away when he saw that Forte had a rifle. Stewart then grabbed Smith and demanded his money. When he refused, Smith was shot in the foot, beaten with the rifle, punched repeatedly, and finally shot in the chest. Smith collapsed and died at the scene. Forte and Stewart grabbed Smith's cash and fled in different directions. Later, they split the money, with Stewart taking about $300. The pair then went to see Ashley Rice, Forte's girlfriend. Forte asked Rice to keep $200 until he could collect it later.

Detective Ken Martinez's investigation led him to Stewart and Forte. Martinez and another officer found the pair at an East 38th Street address near the Bigfoot station. As Martinez approached, Stewart immediately volunteered "that his cousin was getting him locked up for something that he got him into." Asked whether he was talking about what happened at the Bigfoot parking lot, Stewart replied, "Yes." Martinez then asked Stewart and Forte how old they were. When both replied that they were seventeen years old, he immediately stopped asking questions, put the two into separate cars, and transported them to the police station.

At the station, Martinez unsuccessfully attempted to contact Stewart's mother, then located Stewart's father. The father,

upon arriving at the station, told Martinez that he was Stewart's biological father, but that Stewart did not live with him. Martinez provided Stewart and his father with a copy of a "juvenile form" that, in essence, contains the basic *Miranda* warnings as well as the statements, "You have the right to have one or both parents present," and, "The juvenile and his parents are entitled to a conference."

Martinez waited outside the room while Stewart and his father talked for fifteen to thirty minutes. Stewart and his father then signed the waiver of rights at the bottom of the form and Martinez audiotaped Stewart's confession. Stewart was charged with felony murder and robbery as a Class A felony. A jury found him guilty on both counts. The trial court vacated the robbery conviction, and sentenced Stewart to fifty-five years imprisonment for felony murder.

## I. Admissibility of Juvenile Confession

■ Stewart contends the trial court erred in admitting his audiotaped confession. Stewart filed a motion to suppress the confession, which the trial court denied.[1] Indiana Code section 31–32–5–1 provides, in relevant part, that the state and federal constitutional rights of an unemancipated person under eighteen years of age may be waived only:

(2) by the child's custodial parent, guardian, custodian, or guardian ad litem if:

(A) that person knowingly and voluntarily waives the right;

(B) that person has no interest adverse to the child;

(C) meaningful consultation has occurred between that person and the child; and

(D) the child knowingly and voluntarily joins with the waiver.

Ind.Code § 31–32–5–1(2) (1998) (originally enacted as Indiana Code section 31–6–7–3 (1978)). The statute represents the legislature's agreement with this Court's conclusions in *Lewis v. State,* 259 Ind. 431, 439, 288 N.E.2d 138, 142 (1972), that extra protections are necessary when juveniles are faced with the prospect of waiving their constitutional rights. The statute requires the participation of a "custodial parent" and prohibits a unilateral waiver of rights by the child. *Whipple v. State,* 523 N.E.2d 1363, 1370 n. 2 (Ind.1988). The burden is on the State to show that such a waiver occurred beyond a reasonable doubt. *Garrett v. State,* 265 Ind. 63, 65, 351 N.E.2d 30, 32 (1976).

■ An adult's waiver of *Miranda* rights is analyzed in terms of whether it is voluntarily, knowingly, and intelligently given. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *see also Carter v. State,* 730 N.E.2d 155, 157 (Ind.2000). In stating its reasons for overruling Stewart's motion to suppress his confession, the trial court focused on whether Stewart voluntarily waived his rights. Indiana Code section 31–32–5–4 provides trial courts with a non-exclusive list of factors, particular to juveniles, to aid in the determination of voluntariness. However, section 31–32–5–1 imposes additional safeguards where a juvenile's waiver of *Miranda* rights is concerned. Before a court reaches the question of whether a juvenile's waiver is voluntary, it must de-

---

1. It is not clear when the trial court first ruled on Stewart's motion to suppress, although it appears that the ruling took place just before trial. In the middle of trial, the court allowed Stewart to object to the admissibility of the confession and present the testimony of Stewart's father in support. The court then stated its reasons for denying Stewart's motion on the record.

termine whether the proper parties gave the waiver. Section 31–32–5–1 makes it clear that no unemancipated juvenile may unilaterally waive his or her *Miranda* rights; rather, any waiver of a juvenile's constitutional rights is ineffective unless joined by one of the parties named in the section. This requirement is in addition to, and independent of, the inquiry into whether the waiver was voluntarily, knowingly, and intelligently given.

■ If section 31–32–5–1 is violated, "the introduction in evidence of a statement made by a person under eighteen years of age is forbidden." *Stidham v. State*, 608 N.E.2d 699, 700 (Ind.1993). Thus, the principal issue is whether Stewart's biological father qualifies as one of those necessary parties, namely a "custodial parent." The undisputed facts are: (1) Stewart was born out of wedlock; (2) a court award of custody neither appears in the record nor is claimed to exist by either the State or Stewart; and (3) Stewart did not live with his biological father. In light of the foregoing, we conclude that Stewart's father does not qualify as a "custodial parent."

■ Several statutory definitions would exclude Stewart's father from the status of "custodial parent," but none is controlling here. The term "custodial parent" is not defined by section 31–32–5–1. It is defined in Indiana Code section 31–9–2–30 as "the parent who has been awarded physical custody of a child by a court." However, that definition is not dispositive here because, by its terms, the definition applies only to certain listed statutes, and section 31–32–5–1 is not among them.[2] In addition, Indiana Code section 31–14–13–1, a part of the laws addressing "Establishment of Paternity," states, "A biological mother of a child born out of wedlock has sole legal custody of the child, unless a statute or court order provides otherwise." However, that statute makes no mention of its potential application to section 31–32–5–1. By contrast, the definition of "custodian" in section 31–9–2–31, "a person with whom a child resides," is to be used "for purposes of the juvenile law" and presumably applies to all of Title 31, "Family Law and Juvenile Law." Though none of these provides a direct answer to the present issue, all three statutes point toward the conclusion that a "custodial parent" is understood to mean either a person who has been adjudicated by a court to have legal custody of the child, or a parent who actually resides with the unemancipated juvenile.

The conclusion that this definition is appropriate for section 31–32–5–1 is reinforced by our holding in *Graham v. State*, 464 N.E.2d 1 (Ind.1984). In *Graham*, this Court held that even though a juvenile was a legal ward of the Howard County Welfare Department, his father was a "custodial parent" under section 31–32–5–1 because the juvenile "actually resided with his grandmother and father." *Id.* at 4. Thus, *Graham* implied that, for the purposes of section 31–32–5–1, "custodial parent" means either a parent who has legal custody, or a parent with whom the juvenile resides at the time of the interrogation.

Because of their biological relationship, the State contends that Stewart's father

---

2. Section 31–9–2–30 states that the definition of "custodial parent" is given "for purposes of IC 31–14–13–8 [Custody Modification Proceeding; Violation of Injunction or Temporary Restraining Order as Factor], IC 31–14–15 [Temporary Restraining Orders and Permanent Injunctions Against Custodial Parents], IC 31–17–2–22 [Custodial Parent's Violation of Injunction or Temporary Restraining Order; Considered in Custody Modification], and IC 31–17–4 [Visitation Rights of Noncustodial Parent]."

satisfied the requirements of section 31–32–5–1. However, the State offers no explanation of how Stewart's father is a "custodial parent" in the face of these statutory definitions, the case law, and the language of section 31–32–5–1. Rather, the State merely claims that the statute requires only that "his parent" join in Stewart's waiver. This contention plainly reads "custodial" out of the statute. It seems clear that the statute contemplates consultation and waiver by a person in the close relationship afforded by either formal custody or actual residence, in addition to a biological or adoptive relationship. Stewart's father meets neither test. We think the statute and applicable case law are clear that it was error to admit Stewart's statement given in custody despite his purported waiver of rights.

## II. Harmless Error

■ "Errors in the admission or exclusion of evidence are to be disregarded as harmless error unless they affect the substantial rights of a party." *Fleener v. State*, 656 N.E.2d 1140, 1141 (Ind.1995) (citing Ind. Trial Rule 61). "[A]n error will be found harmless if its probable impact on the jury, in light of all of the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties." *Id.* at 1142. Therefore, we must assess the probable impact of Stewart's confession on the jury, in light of all the other evidence the State presented at trial.

■ In addition to Stewart's confession, the State presented the witness testimony of Ashley Rice, Forte's girlfriend. Rice testified that she knew Stewart and that he went by the nickname "Man." She testified that Forte and Stewart met her on a street corner near her house and Forte gave her $200 that he later returned to collect. She also overheard Stewart tell Forte, "I think he's dead, man. You hit him too hard." She could not remember Stewart saying anything else.

The State also presented the witness testimony of Detective Martinez. Martinez testified that, in the course of his investigation, he "learned that the two possible individuals involved in this had the nickname of Man and the first name of Damon." Martinez obtained a physical description of the person nicknamed "Man," and an address where he could locate Forte. Martinez also spoke with Rice and discovered that Forte was Rice's boyfriend. Eventually, Martinez found Forte and Stewart.

Martinez testified that, when he encountered Forte and Stewart, Stewart immediately volunteered the statement "that his cousin was getting him locked up for something that he got him into." Stewart acknowledged that he was talking about "something to do with what happened on the Bigfoot ... parking lot." Stewart made no other statements to Martinez other than his confession. Finally, the gun used to kill Smith was found in the area where Forte and Stewart were arrested.

■ But for Stewart's confession, the State presented no evidence directly placing Stewart at the scene of Smith's murder. We do not discount the significance of the State's other evidence; however, we are unwilling to say that, in comparison to the probable impact of Stewart's confession, the trial court's error did not affect Stewart's substantial rights. The confession definitively established Stewart's role in the commission of the robbery and murder of Smith. The jury did not have to piece together Stewart's culpability from the collage of what Rice overheard Stewart say to Forte, Stewart's spontaneous statement to Martinez, and where the gun was found. The jury had Stewart, on tape, admitting his guilt. The probable impact of this evidence on the jury, in light of the other evidence, is not "sufficiently minor" so as not to affect Stewart's substantial rights. Therefore, the trial court's error in admitting Stewart's confession was not harmless. Double jeopardy does not bar a retrial. *Robinette v. State*, 741 N.E.2d 1162, 1167–68 (Ind.2001); *Smith v. State*, 721 N.E.2d 213, 220 (Ind.1999).

## Conclusion

We reverse the conviction and remand for a new trial.

SHEPARD, C.J., and DICKSON, SULLIVAN, and RUCKER, JJ., concur.