# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**GLEN E. KOCH II**
Boren, Oliver & Coffey, LLP
Martinsville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana
Indianapolis, Indiana

**ELLEN H. MEILAENDER**
Deputy Attorney General
Indianapolis, Indiana

**FILED**

Aug 02 2012, 8:32 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| N.B., | ) | |
| | ) | |
|     Appellant-Defendant, | ) | |
| | ) | |
|         vs. | ) | No. 55A01-1111-JV-574 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
|     Appellee-Plaintiff. | ) | |

APPEAL FROM THE MORGAN SUPERIOR COURT
The Honorable Christopher L. Burnham, Judge
Cause No. 55D02-1107-JD-280

**August 2, 2012**

**OPINION - FOR PUBLICATION**

**BRADFORD, Judge**

Appellant-Defendant N.B. appeals following the juvenile court's determination that he committed the delinquent act of Reckless Homicide, a Class C felony if committed by an adult. Specifically, N.B. contends that the juvenile court abused its discretion in admitting his statement to the investigating officer at the evidentiary hearing. We affirm.

## FACTS AND PROCEDURAL HISTORY

Eleven-year-old N.B. and six-year-old A.F. were brothers who lived together with Mother, Step-Father,[1] a nine-year-old sister, and a three-year-old brother in Morgan County. N.B. and his siblings were often left home alone with N.B. in charge. On a couple of occasions, N.B. had pointed a firearm belonging to Mother and Step-Father at his siblings to scare them into complying with his requests.

N.B.'s previous step-father had begun teaching N.B. about firearms and firearm safety when N.B. was nine years old. N.B. was taught never to touch a firearm without an adult present, always to assume that a firearm is loaded, always to check to make sure that the firearm is empty, and always to ensure that the safety mechanism is on. While hunting with his previous step-father, N.B. had witnessed animals being shot and killed by a firearm.

On June 30, 2011, N.B. and A.F. were left home alone. Mother told the boys that they would be able to get pizza for dinner if they cleaned the bedroom they shared while the rest of the family was gone. N.B. became upset when A.F. refused to clean their room. N.B. retrieved Mother and Step-Father's .22 caliber rifle from the master bedroom and again

---

[1] It is unclear from the record whether Mother and Step-Father were married or merely living together. It is clear from the record, however, that N.B. viewed Step-Father as a father-figure and referred to him as "Dad." Therefore, for the purposes of this opinion, we will refer to him as Step-Father.

instructed A.F. to clean their bedroom. When A.F. again refused, N.B. pulled the trigger, shooting A.F. between the eyes.

After shooting A.F., N.B. returned the rifle to the master bedroom and called 911. N.B. told the 911 dispatcher that his brother had shot himself in the head. A.F. later died as a result of the gunshot wound to the head.

Morgan County Sheriff's Detective Dan Downing spoke with N.B. briefly after arriving at N.B.'s home. During this conversation, N.B. again indicated that A.F. had shot himself. In light of N.B.'s emotional state, N.B. was taken to Susie's Place, an independent, child-friendly advocacy center in Hendricks County, to be more fully interviewed in a less traumatic location. During this interview, N.B. again stated that A.F. had shot himself.

During their investigation, police officers recovered a .22 caliber rifle from inside the master bedroom. The rifle was in good working order, the safety was off, and there was a casing inside the gun. The officers also found two boxes of .22 caliber cartridges lying on a dresser in the master bedroom and a spent .22 caliber casing on the floor. The casing was fired from the rifle. The officers also discovered a latent print of N.B.'s left ring finger on the magazine, as well as prints of N.B.'s right thumb and right middle finger on the box of cartridges.

An autopsy was conducted on A.F. the following morning, after which it was determined that it would have been physically impossible for the fatal gunshot wound to have been self-inflicted with the rifle in question. After reviewing the autopsy results, Detective Downing contacted Mother, told her that there were discrepancies in N.B.'s statement that

needed to be cleared up, and requested permission to re-interview N.B. Mother took Detective Downing's request to mean that he did not believe that N.B. had been truthful in his earlier statement. Mother agreed to allow N.B. to talk to Detective Downing. Later that afternoon, N.B. arrived at the sheriff's department with his maternal grandmother ("Grandmother") and was met by Mother and Step-Father. Mother, Step-Father, Grandmother, and, at the family's request, a chaplain were present during Detective Downing's interview with N.B.

After N.B. and his family arrived at the sheriff's department, Detective Downing again indicated that he wished to discuss certain discrepancies in N.B.'s prior statement and the autopsy results with N.B. Detective Downing gave Mother and N.B. papers setting forth N.B.'s rights. After ascertaining that N.B. could read, Detective Downing instructed Mother and N.B. to read the papers and inquired as to whether each understood N.B.'s constitutional rights. Both responded in the affirmative and signed the acknowledgment and waiver forms.

Detective Downing then informed the family that he was going to leave the room and turn off all recording devices to provide the family with an opportunity to discuss amongst themselves whether they believed that N.B. should answer his questions. Fifteen to twenty minutes later, Detective Downing returned to the room and asked N.B., "Okay. Well, do you want to tell me what happened?" State's Ex. 69A, p. 2. N.B. responded by telling Detective Downing that he had shot A.F. N.B.'s family demonstrated love and concern for N.B. At no time did Mother, or any other family member, indicate that they did not want N.B. to speak to Detective Downing.

4

On July 1, 2011, the State filed a delinquency petition alleging that N.B. had engaged in conduct that would constitute murder and Class C felony reckless homicide if committed by an adult. On August 10, 2011, N.B. filed a "motion to quash" his July 1, 2011 statement to Detective Downing. The juvenile court conducted a suppression hearing on N.B.'s motion on August 23, 2011. The juvenile court denied N.B.'s motion on August 24, 2011.

The juvenile court conducted an evidentiary hearing on September 6-7, 2011. On September 9, 2011, the juvenile court issued an order adjudicating N.B. delinquent for committing what would be Class C reckless homicide if committed by an adult. The juvenile court determined that the State had failed to prove that N.B. committed what would be murder if committed by an adult. At the dispositional hearing, which was conducted on November 14, 2011, the juvenile court ordered that N.B. be placed in the Children's Bureau Program. This appeal follows.

## DISCUSSION AND DECISION

N.B. contends that the juvenile court erred in admitting his statement to Detective Downing because the procedural safeguards for the waiver of a juvenile's constitutional rights, as required by Indiana Code section 31-32-5-1 (2010) (the "juvenile waiver statute"), were not followed. Specifically, N.B. claims that Mother was not an appropriate custodian to join in the waiver of his rights because she had an adverse interest to N.B. and that his waiver was not knowing or voluntary because he executed the written waiver before being afforded an opportunity for meaningful consultation with Mother. For its part, the State argues that the juvenile court properly admitted N.B.'s statement because N.B. was not in custody at the

5

time he spoke to Detective Downing, and, alternatively, because the procedural safeguards set forth by the juvenile waiver statute were met.

## I. Whether N.B. was Subjected to a Custodial Interrogation

As a general rule, when a juvenile who is not in custody gives a statement to police, neither the safeguards of a *Miranda*[2] warning nor the juvenile waiver statute is implicated. *A.A. v. State*, 706 N.E.2d 259, 261 (Ind. Ct. App. 1999). Thus, the threshold issue is whether N.B. was subject to a custodial interrogation when he gave his statement. *Id.* "For an interrogation to be custodial in nature, one does not necessarily have to be under arrest." *Id.* "To be custodial in the non-arrest context, the interrogation must commence after the person's freedom of action has been deprived in any significant way." *Id.* This is determined by examining whether a reasonable person in similar circumstances would believe he is not free to leave. *S.D. v. State*, 937 N.E.2d 425, 430 (Ind. Ct. App. 2010).

The parties do not discuss whether N.B. was interrogated. "The term 'interrogation' has been defined as a process of questioning by law enforcement officials which lends itself to obtaining incriminating statements." *A.A.*, 706 N.E.2d at 261 (citing *Jenkins v. State*, 627 N.E.2d 789, 796 (Ind. 1993)). The record shows that Detective Downing requested permission for N.B. to appear at the sheriff's department to clarify certain discrepancies in his prior statement which came to light following the autopsy of A.F. The line of questioning posed by Detective Downing elicited an incriminating response from N.B., *i.e.*, that N.B. had shot A.F. Thus, we conclude that N.B. was interrogated by Detective Downing.

---

[2] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

Here, the trial court found that N.B. was in custody at the time he was interviewed by Detective Downing. The parties dispute this finding with N.B. arguing that the trial court properly found that N.B. was in custody and the State arguing that N.B. was not in custody when he was interviewed by Detective Downing. However, we need not determine whether N.B. was in custody because, as will be discussed below, we conclude that the procedural safeguards set forth in the juvenile waiver statute were met.

### II. Whether the Procedural Safeguards Set Forth in the Juvenile Waiver Statute Were Followed

We next consider whether the procedural safeguards for the waiver of a juvenile's constitutional rights, as required by the juvenile waiver statute, were followed. Indiana Code section 31-32-5-1 provides, in relevant part, as follows:

> Any rights guaranteed to a child under the Constitution of the United States, the Constitution of the State of Indiana, or any other law may be waived only:
> ****
> (2) by the child's custodial parent, guardian, custodian, or guardian ad litem if:
> (A) that person knowingly and voluntarily waives the right;
> (B) that person has no interest adverse to the child;
> (C) meaningful consultation has occurred between that person and the child; and
> (D) the child knowingly and voluntarily joins with the waiver[.]

Thus, in Indiana, there are four requirements that must be satisfied before a juvenile's statements made during a custodial interrogation can be used in the State's case-in-chief. *D.M. v. State*, 949 N.E.2d 327, 333-34 (Ind. 2011).

> First, both the juvenile and his or her parent must be adequately advised of the juvenile's rights. *Miranda*, 384 U.S. at 444-45, 467-74, 478-79, 86 S.Ct. 1602; [*Lewis v. State*, 259 Ind. 431, 439, 288 N.E.2d 138, 142 (1972)]. Second, the juvenile must be given an opportunity for meaningful consultation with his or her parent. I.C. § 31–32–5–1(2); *Lewis*, 259 Ind. at 439, 288 N.E.2d at 142.

7

Third, both the juvenile and his or her parent must knowingly, intelligently, and voluntarily waive the juvenile's rights. I.C. § 31–32–5–1(2); *Miranda*, 384 U.S. at 475-76, 86 S.Ct. 1602. Finally, the juvenile's statements must be voluntary and not the result of coercive police activity. *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

*Id*. at 334.

Here, N.B. challenges the juvenile court's denial of his motion to suppress on two fronts. First, he contends that Mother was not an appropriate custodian to join in the waiver of his rights because she had an interest adverse to N.B.'s. Second, he contends that his waiver was not knowing or voluntary because he executed the written waiver before being afforded an opportunity for meaningful consultation with Mother.

The State bears the burden of proving beyond a reasonable doubt that the juvenile received all of the protections of Indiana Code section 31-32-5-1, *Brown v. State*, 751 N.E.2d 664, 670 (Ind. 2001), and that both the juvenile and his or her parent knowingly, intelligently, and voluntarily waived the juvenile's rights, *Stewart v. State*, 754 N.E.2d 492, 494-95 (Ind. 2001). *Cf. Douglas v. State*, 481 N.E.2d 107, 111-12 (Ind. 1985) (procedural safeguards judged by same standard as voluntariness). In reviewing a court's denial of a motion to suppress a confession, we do not reweigh the evidence but instead examine the record to determine whether there is substantial evidence of probative value to support that decision. *Willsey v. State*, 698 N.E.2d 784, 789 (Ind. 1998). We consider any conflicting evidence in a light most favorable to the juvenile court's decision, *Brown*, 751 N.E.2d at 670, along with any substantial uncontested evidence, *Douglas*, 481 N.E.2d at 111-12. And we will uphold the decision if it is supported by "a reasonable view of the evidence." *Willsey*, 698 N.E.2d at 789.

*Id*. at 334-35.

## A. Adverse Interests

N.B. claims that Mother was not an appropriate custodian to join in the waiver of his constitutional rights because she had an interest adverse to N.B.'s. Specifically, N.B. argues

that Mother had an adverse interest because, at the time N.B. spoke to Detective Downing, Mother potentially faced criminal charges for neglect of a dependent resulting in death. However, the mere fact that Mother faced potential criminal liability relating to A.F.'s death does not create an interest adverse to N.B.'s. Here, Mother faced potential criminal liability regardless of how A.F. was shot, whether at N.B.'s hands or by his own.

Indiana Code section 35-46-1-4 (2010) provides, in relevant part, that "[a] person having the care of a dependent … who knowingly or intentionally … places the dependent in a situation that endangers the dependent's life or health … commits a Class A felony if it is committed … by a person at least eighteen (18) years of age and results in the death of a dependent who is less than fourteen (14) years of age." In the instant matter, the record demonstrates that Mother, who had responsibility for the care and control of N.B. and A.F., left an eleven-year-old and a six-year-old at home alone, unsupervised, with ready access to an unsecured and loaded firearm, and the six-year-old ended up fatally shot in the head by that firearm. Mother's potential liability under Indiana Code section 35-46-1-4 would not be dependent upon which of the children actually fired the fatal shot but rather upon whether she knowingly or intentionally left N.B. and A.F. alone in a home with access to an unsecured and loaded firearm, placing the children in a situation that resulted in the death of a child under the age of fourteen. *See* Ind. Code § 35-46-1-4. N.B. fails to show how Mother's potential criminal liability for any neglect of N.B. and A.F., which again was not dependent upon whether N.B. or A.F. actually fired the fatal shot, affected her ability to act in accordance with N.B.'s interests.

Furthermore, to the extent that N.B. relies upon this court's conclusion in *Borum v. State*, 434 N.E.2d 581 (Ind. Ct. App. 1982), to support his claim that Mother had an interest adverse to N.B.'s, we conclude that *Borum* is readily distinguishable from the instant matter. In *Borum*, the juvenile's legal guardian, a caseworker for the Department of Public Welfare, initiated the proceedings against the juvenile by filing a charging petition. 434 N.E.2d at 583. In concluding that the caseworker could not appropriately waive the juvenile's rights, the court determined that the juvenile's caseworker "had not only filed the petition initiating the proceedings, but was also an employee of the state agency which had effectively assumed the role of an adverse party." *Id*. at 584. As such, the caseworker's interests were adverse to those of the juvenile. *Id*.

No such conflict exists here. When Mother encouraged N.B. to waive his rights and tell the truth, she was neither acting as an agent for the police or prosecutor nor acting as a key witness against N.B. in any of the potential charges he might face. To the contrary, Mother, in addition to the other family members present, expressed her love and concern for N.B. during the interview with Detective Downing. This court's holding in *Borum* in inapplicable to the instant matter.

Further still, to the extent that N.B. claims that Mother was not an appropriate custodian to join in the waiver of his constitutional rights because she is the parent of both N.B. and the victim, the Indiana Supreme Court has held that the parent of an alleged juvenile delinquent does not have a conflict of interest by virtue of being a parent of both the juvenile and the victim. *See K.S. v. State*, 849 N.E.2d 538, 543 (Ind. 2006) (providing that

10

the alleged juvenile delinquent's mother did not have an adverse interest to the juvenile merely because she was also the victim's mother); *Whipple v. State*, 523 N.E.2d 1363, 1369-70 (Ind. 1988) (providing that a grandfather who, acting as his grandson's custodian, advised his grandson to waive his right to remain silent did not have interests adverse to grandson who murdered his mother and father–the grandfather's daughter and son-in-law). As such, Mother was not an inappropriate custodian merely because she was both N.B. and A.F.'s mother.

## B. Knowing and Voluntary Waiver and the Reasonable Opportunity for Meaningful Consultation

N.B. also claims that his waiver was neither knowing nor voluntary. Specifically, N.B. argues that his written waiver was defective because it occurred before he had an opportunity for a meaningful consultation and that the record does not support the finding that he impliedly waived his rights. The State, for its part, argues that the record demonstrates that N.B. impliedly waived his rights after receiving the opportunity to engage in meaningful consultation with Mother, Step-Father, and Grandmother.

Indiana Code section 31-32-5-1 requires that, before a juvenile's rights are waived, he or she must be afforded an opportunity for meaningful consultation with a parent. *D.M.*, 949 N.E.2d at 335.

> The mere presence of a parent, standing alone, does not satisfy the statute. *Hall v. State*, 264 Ind. 448, 451, 346 N.E.2d 584, 587 (1976). Rather, the consultation requirement is satisfied "when the State demonstrates 'actual consultation of a meaningful nature or ... the express opportunity for such consultation, which is then forsaken in the presence of the proper authority by the juvenile, so long as the juvenile knowingly and voluntarily waives his [or her] constitutional rights.'" *Brown*, 751 N.E.2d at 670 (ellipsis in original)

11

(quoting *Williams v. State*, 433 N.E.2d 769, 772 (Ind. 1982)). Additionally, the opportunity for the juvenile and the parent to counsel with each other must occur before the juvenile's rights are waived because the purpose of consultation is to allow the juvenile to make a decision on whether to waive his or her rights in a comparatively relaxed and stable atmosphere. *Patton v. State*, 588 N.E.2d 494, 496 (Ind. 1992); *cf. Lewis v. State*, 259 Ind. at 439-40, 288 N.E.2d at 142.

To prove that "actual consultation of a meaningful nature" occurred, the State needs only to prove that the police provided a relatively private atmosphere that was free from police pressure in which the juvenile and the parent could have had a meaningful discussion about the "allegations, the circumstances of the case, and the ramifications of their responses to police questioning and confessions." *Trowbridge v. State*, 717 N.E.2d 138, 148 (Ind. 1999); *see also Hall*, 264 Ind. at 452, 346 N.E.2d at 587 (providing that "meaningful consultation can only occur in the absence of the neutralizing pressures which result from police presence"). The interrogating officer cannot dictate or even recommend how they should use this time. *Trowbridge*, 717 N.E.2d at 148; *Patton*, 588 N.E.2d at 495 n.3; [*Whipple*, 523 N.E.2d at 1371]; *Buchanan v. State*, 268 Ind. 503, 506-07, 376 N.E.2d 1131, 1134 (1978). "What is important is that the child and adult be aware of and understand the child's rights in order to discuss them intelligently." *Patton*, 588 N.E.2d at 496. Once such an opportunity is provided, it is up to the juvenile and the parent to use this opportunity to their advantage. *Id*. at 495 n.3; *Whipple*, 523 N.E.2d at 1371. The State need not show that the consultation was beneficial in helping the juvenile and his or her parent decide whether to waive or stand on the juvenile's rights. *Fortson v. State*, 270 Ind. 289, 298-99, 385 N.E.2d 429, 436 (1979); *cf. Trowbridge*, 717 N.E.2d at 148; *Fowler v. State*, 483 N.E.2d 739, 743 (Ind. 1985); *Buchanan*, 268 Ind. at 506-07, 376 N.E.2d at 1134. Rather, the extent to which the conversation aids in the waiver decision "is a circumstance among many others which the trial court may consider in arriving at its decision as to whether the waiver is voluntary and knowing." *Fortson*, 270 Ind. at 299, 385 N.E.2d at 436.

*Id*. at 335-36 (bracketed material supplied).

It is uncontested that N.B. signed the waiver form acknowledging and waiving his rights before he was afforded approximately fifteen to twenty minutes of meaningful consultation with Mother, Step-Father, and Grandmother. As such, the written waiver form alone is insufficient to satisfy the requirements of Indiana Code section 31-32-5-1. However,

12

the requirements of Indiana Code section 31-32-5-1 may still be met and N.B.'s waiver found knowing and voluntary if the record demonstrates that N.B. impliedly waived his rights after being afforded the opportunity to engage in meaningful consultation with Mother.

The Indiana Supreme Court has held that while a written waiver is certainly strong proof that a valid waiver occurred, "an express oral or written statement is not required to establish a knowing and voluntary waiver of rights–valid waivers may be implied." *Id*. at 339. "Generally, a valid implied waiver occurs where a suspect who has been advised of his or her *Miranda* rights and has acknowledged an understanding of those rights makes an uncoerced statement without taking advantage of them." *Id*.

> In determining the voluntariness of a *Miranda* waiver, we examine the totality of the circumstances surrounding the interrogation to determine whether the suspect's choice "was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and whether the waiver was "made with a full awareness of both the nature of the right[s] being abandoned and the consequences of the decision to abandon [them]." [*Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135 (1986)]; *see also* [*Crain v. State*, 736 N.E.2d 1223, 1230 (Ind. 2000)] (reviewing totality of the circumstances to ensure that waiver was "not induced by violence, threats, or other improper influences that overcame the defendant's free will"); *cf.* [*Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560 (1979)] (holding that the totality-of-the-circumstances test applies to juvenile waivers). Relevant considerations include the juvenile's physical, mental, and emotional maturity; whether the juvenile or his or her parent understood the consequences of the juvenile's statements; whether the juvenile and his or her parent were informed of the delinquent act for which the juvenile was suspected; the length of time the juvenile was held in custody before consulting with his or her parent; whether there was any force, coercion, or inducement; and whether the juvenile and his or her parent had been advised of the juvenile's *Miranda* rights. I.C. § 31-32-5-4; *see also Michael C.*, 442 U.S. at 725-27, 99 S.Ct. 2560.

*D.M.*, 949 N.E.2d at 339-40 (first two sets of bracketed material in the original, all other bracketed material supplied).

The totality of the circumstances surrounding the interrogation of N.B. supports the juvenile court's conclusion that he knowingly, intelligently, and voluntarily waived his rights. Shortly after the conclusion of A.F.'s autopsy, Detective Downing contacted Mother and requested permission to re-interview N.B. regarding certain discrepancies between his prior statement and the autopsy results. Mother agreed. Grandmother transported N.B. to the sheriff's department where she and N.B. were met by Mother and Step-Father. After N.B. and his family arrived at the sheriff's department, Detective Downing again indicated that he wished to discuss certain discrepancies between N.B.'s prior statement and the autopsy results. Detective Downing gave Mother and N.B. papers setting forth and explaining N.B.'s rights, including his rights to remain silent and to an attorney. After ascertaining that N.B. could read, Detective Downing instructed Mother and N.B. to read the papers and inquired as to whether each understood N.B.'s constitutional rights. Both responded in the affirmative and signed the acknowledgment and waiver forms.

Detective Downing then informed the family that he was going to leave the room and turn off all recording devices to provide the family with an opportunity to discuss amongst themselves whether they believed that N.B. should answer his questions. Fifteen to twenty minutes later, Detective Downing returned to the room and asked N.B. "Okay. Well, do you want to tell me what happened?" State's Ex. 69A, p. 2. N.B.'s actions immediately thereafter indicated that he wished to waive his rights as he then told Detective Downing what happened the day before, including the fact that he had shot A.F. At no time did Mother, or any other family member, indicate that they did not want N.B. to continue, and

14

Mother, as well as Step-Father and Grandmother, encouraged N.B. to tell the truth. Further, N.B. did not indicate at any point that he did not wish to talk to Detective Downing and nothing in the record indicates that Detective Downing coerced N.B. to talk.

N.B. was not held in police custody prior to being brought to the sheriff's department for the purpose of giving the statement, and the record does not demonstrate that he was coerced to talk in any way. He was surrounded at all times by family members who demonstrated love and concern for him and encouraged him to tell the truth.[3] Based on the totality of the circumstances, we agree with the trial court's determination that while "the signing of the waiver form should, under best practices, occur after the parent and child have had an opportunity for meaningful consultation," Appellant's App. p. 81 (emphasis omitted), under the facts of this case, N.B. impliedly waived his rights after engaging in meaningful consultation with Mother, and that both N.B.'s and Mother's waiver was knowing and voluntary.

The judgment of the juvenile court is affirmed.

VAIDIK, J., and CRONE, J., concur.

---

[3] We do not believe that the fact that a reasonable person might not believe that he was free to go without permission from Detective Downing or his adult chaperones would impact N.B.'s ability to knowingly or voluntarily waive his rights to an attorney or to remain silent after being encouraged to tell the truth by these same adult chaperones.