

I N  T H E

# Indiana Supreme Court

Supreme Court Case No. 24S-JV-298

## J.Q.R.,
*Appellant*

**FILED**

Mar 12 2025, 12:44 pm

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

–v–

## State of Indiana,
*Appellee*

---

Argued: October 31, 2024 | Decided: March 12, 2025

Appeal from the Hendricks Superior Court
No. 32D03-2303-JD-49
The Honorable Ryan W. Tanselle, Judge

On Petition to Transfer from the Indiana Court of Appeals
No. 23A-JV-1879

---

**Opinion by Chief Justice Rush**

Justices Massa, Slaughter, Goff, and Molter concur.

**Rush, Chief Justice.**

The United States and Indiana Constitutions protect Hoosiers' rights against self-incrimination and ensure that only voluntary statements made to police can be used against them in criminal prosecutions. We have long recognized that children are uniquely vulnerable to the coercive pressure of police interrogation, and our General Assembly has imposed additional safeguards through the juvenile-waiver statute. This statute limits a child's ability to waive their rights and speak to police by imposing several procedural prerequisites. Among these requirements, a parent may waive their child's rights only if they have no interest adverse to the child. This case presents a question of first impression: whether a parent's own criminal conduct can produce an adverse interest.

Here, a fifteen-year-old child's father twice waived the child's rights, and the child made incriminating statements to a detective about selling pills to his classmates. At the time of both waivers, the detective had discovered evidence that the child's father was also engaged in illegal drug activity. And three other relatives were present but not consulted before the first waiver. During the delinquency proceedings, the child objected to the admission of his statements to the detective, arguing that his father had an adverse interest at the time of both waivers. The trial court disagreed and admitted the child's statements into evidence, ultimately adjudicating him a delinquent child.

Based on the text of the juvenile-waiver statute, we hold that an adverse interest may arise if the evidence shows an adult stands to personally benefit from waiving a child's rights to the child's detriment. Because the record here unequivocally includes such evidence, the State failed to meet its burden to prove the father had no interest adverse to the child each time he waived his son's rights. Thus, we hold that the trial court erred in admitting the child's statements. But because we hold that the error was harmless, we affirm.

# Facts and Procedural History

Fifteen-year-old J.Q.R. sold pills to two freshman classmates, B.H. and R.J., after they asked him for Percocet M30 pills. Though pharmaceutical grade Percocet M30 pills contain oxycodone, the pills J.Q.R. sold contained fentanyl. B.H. and R.J. were aware the pills contained fentanyl, and they each consumed about one-eighth of a pill at B.H.'s house. R.J. then "did more" later that night at his house.

Tragically, in what has become a far too common occurrence, R.J. was found dead in his bedroom the next day from a fentanyl overdose. Law enforcement immediately began to investigate, and a detective spoke with both R.J.'s family and B.H. From B.H., the detective learned details about the previous day's drug sale as well as J.Q.R.'s address. Using this information, the detective quickly secured a warrant to search J.Q.R.'s home for a broad array of items including "any and all" illegal drugs or drug paraphernalia. Around 11:00 p.m. that night, several police officers arrived at the home, which was owned by J.Q.R.'s paternal grandparents, to execute the search.

J.Q.R.'s father ("Father") answered the door wearing a t-shirt that read "Have a Good Trip," with imagery alluding to psychedelic drug use. The officers then gathered everyone—Father, J.Q.R., his mother, his grandparents, and his younger brother—in the living room where the detective read the search warrant and officers seized J.Q.R.'s phone. Soon after the officers began the search, they found a wallet containing Father's expired driver's license and "some white powder in a small baggie" that the detective "believed . . . was going to be heroin." The detective then pulled J.Q.R. and Father into the kitchen where he advised them of J.Q.R.'s *Miranda* rights and asked them to privately discuss whether J.Q.R. wished to waive his rights and consent to questioning.

J.Q.R. and Father spoke privately in a bedroom and emerged a short time later. Father informed the detective they "were willing to speak" with him but wanted to do so "out of ear shot of other people." So the three went back into the bedroom, and the detective shut the door and began questioning J.Q.R. During the interrogation, Father asserted several

times that he did not know what was going on and that he wanted what was best for J.Q.R. He also referenced his own experience with police and even joined in the questioning, pressing J.Q.R. to say whether he had given the pills to classmates or sold them and asking whether he knew the pills contained fentanyl. J.Q.R. confirmed he had sold the pills knowing they contained fentanyl. The detective then asked J.Q.R. to show him where the pills were located, and J.Q.R. led him and Father to an upstairs closet. The interrogation continued in the upstairs hallway, where Father encouraged J.Q.R. to answer the detective's questions, and J.Q.R. relayed that he had bought the pills from an adult, Trevor Strickland. J.Q.R. also told the detective, to Father's surprise, that Father had driven him to his classmate's house to sell the pills. Father posed more questions to J.Q.R. and disputed any involvement in the pill sale, telling the detective, "I don't know about any of this."

The police ultimately found and seized two bottles containing pills, some of which matched those found in R.J.'s bedroom; a box addressed to Father from California containing THC vape cartridges; and a ledger with a list of names and amounts owed totaling over $9,000. Police later secured a search warrant for the contents of J.Q.R.'s phone, which contained information about R.J.'s payment for the pills and texts between J.Q.R. and B.H. and between J.Q.R. and Strickland.

A little after midnight, as officers concluded the search, the detective drove Father and J.Q.R. to the police station to conduct a second interrogation. Father again waived J.Q.R.'s *Miranda* rights. The detective then questioned J.Q.R. further about the pill sale, and J.Q.R. eventually admitted to also selling THC vape pens to his friends. But he denied knowing about or having used the ledger. Father initially seemed surprised when hearing about the ledger but then stated that it was "old, old stuff" he had used "years ago." As the interrogation ended, the detective asked J.Q.R. for the passcode to his phone, which he provided. The detective later confirmed through J.Q.R.'s text messages that Father was supplying J.Q.R. with THC vape cartridges to sell.

The day after the search, the detective arrested Father and J.Q.R. The State ultimately charged Father with six felonies and one misdemeanor

and listed J.Q.R. as a potential witness for Father's prosecution. Father eventually pleaded guilty to Level 5 felony dealing in marijuana, including a habitual offender enhancement, and is serving a seven-year sentence. As for J.Q.R., the State filed a delinquency petition alleging that he committed six offenses. The State also listed Father as a witness for J.Q.R.'s fact-finding hearing.

During the fact-finding hearing, J.Q.R. moved to suppress both the disclosure of his phone's passcode and his statements to the detective at his home and at the police station. He challenged his passcode disclosure under the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. And he challenged his statements to the detective in part under Indiana's juvenile-waiver statute, arguing that because Father had an interest adverse to J.Q.R. each time they consulted and agreed that J.Q.R. would speak with police, the State had failed to show he received the protections embedded in the statute. The trial court denied the motion. Later, over J.Q.R.'s objections, the court admitted into evidence J.Q.R. and Father's conversations with the detective at both the home and police station. The court ultimately found J.Q.R. delinquent for committing acts that if committed by an adult would be Level 1 felony dealing in a controlled substance resulting in death, Level 5 felony dealing in a narcotic drug, and Level 6 felony possession of a narcotic drug. The court granted wardship of J.Q.R. to the Department of Correction and recommended he be detained until his eighteenth birthday.

J.Q.R. appealed, arguing that the trial court abused its discretion by admitting his statements. The Court of Appeals disagreed and affirmed. *J.Q.R. v. State*, 232 N.E.3d 654, 657 (Ind. Ct. App. 2024). J.Q.R. then petitioned for transfer, which we granted, vacating the Court of Appeals' opinion. Ind. Appellate Rule 58(A).[1]

---

[1] We summarily affirm the portion of the Court of Appeals' opinion holding that the trial court did not abuse its discretion by granting the State's motion to continue the fact-finding hearing. *See* App. R. 58(A)(2).

## Standard of Review

Because J.Q.R. asserts the trial court abused its discretion by admitting his statements into evidence without a valid waiver of rights as required by statute, this case involves two standards of review. We review these evidentiary rulings for an abuse of discretion, which occurs when the ruling is either clearly against the logic and effect of the facts and circumstances before the court, or when it misinterprets the law. *Williams v. State*, 43 N.E.3d 578, 581 (Ind. 2015). But we review issues of statutory interpretation de novo. *Bojko v. Anonymous Physician*, 232 N.E.3d 1155, 1158 (Ind. 2024).

## Discussion and Decision

Both the United States Constitution and the Indiana Constitution protect an individual's privilege against self-incrimination and ensure that only their voluntary statements can be used against them in a criminal prosecution. *See* U.S. Const. amends. V, XIV, § 1; Ind. Const. art. 1, § 14; *D.M. v. State*, 949 N.E.2d 327, 332–33 (Ind. 2011). These protections extend to situations when law enforcement questions a juvenile "who is in custody—i.e., custodial interrogation." *D.M.*, 949 N.E.2d at 333. Because such interrogations employ "inherently compelling pressures," police must first inform a suspect of their constitutional rights, including the rights to remain silent and to an attorney. *Miranda v. Arizona*, 384 U.S. 436, 467–73 (1966). These *Miranda* rights are "especially important" for juveniles, as they are "particularly vulnerable" to an interrogation's coercive effects. *B.A. v. State*, 100 N.E.3d 225, 230 (Ind. 2018).

Indiana has long been at the forefront of recognizing this vulnerability by imposing additional safeguards that must be met before a juvenile can waive their rights. Over fifty years ago, we held that both the juvenile and their parent or guardian must not only be advised of the juvenile's *Miranda* rights but also be given a chance to consult to determine whether the juvenile should waive those rights. *Lewis v. State*, 288 N.E.2d 138, 142 (Ind. 1972). We later clarified that this opportunity for consultation must be "meaningful," which "can only occur in the absence of the neutralizing

pressures" that result from "police presence." *Hall v. State*, 346 N.E.2d 584, 586–87 (Ind. 1976). And we then explained that the meaningful consultation must be with an adult "who, by nature, would have the best interest of the suspect uppermost in his thoughts." *Buchanan v. State*, 376 N.E.2d 1131, 1134 (Ind. 1978). That same year, our Legislature enshrined these safeguards in a statute now codified at Indiana Code section 31-32-5-1 (the "Juvenile Waiver Statute"). Pub. L. No. 136, § 1, 1978 Ind. Acts 1196, 1232–33.

Under the Juvenile Waiver Statute, an unemancipated child cannot unilaterally waive their *Miranda* rights. *See* Ind. Code § 31-32-5-1. One way such a child can waive these rights is through a "custodial parent, guardian, custodian, or guardian ad litem" but only if four requirements are satisfied. *Id.* § -1(2). The qualified adult must knowingly and voluntarily waive the child's rights, and the child must knowingly and voluntarily join the waiver. *Id.* § -1(2)(A), (D). They must also engage together in "meaningful consultation," *id.* § -1(2)(C), which is designed to ensure that the child can decide whether to waive their rights "in a comparatively relaxed and stable atmosphere," *D.M.*, 949 N.E.2d at 335. Finally, the adult must have "no interest adverse to the child." *Id.* § -1(2)(B). The State bears the heavy burden of proving beyond a reasonable doubt that each requirement was met. *See Taylor v. State*, 438 N.E.2d 275, 283 (Ind. 1982); *D.M.*, 949 N.E.2d at 334. If that burden is not satisfied, "the introduction in evidence of a statement made by" the child "is forbidden." *Stewart v. State*, 754 N.E.2d 492, 495 (Ind. 2001) (quoting *Stidham v. State*, 608 N.E.2d 699, 700 (Ind. 1993)).

At issue here is whether the record supports a conclusion that the State met its burden to satisfy the Juvenile Waiver Statute's requirement that Father had "no interest adverse" to J.Q.R. at the time of the waivers. I.C. § 31-32-5-1(2)(B). Though the subsequent statute permits a child to waive their right to meaningful consultation, *id.* § -5-2, no provision allows a child to waive the no-adverse-interest requirement. And unlike other protections in the Juvenile Waiver Statute, we have rarely had occasion to interpret the meaning and scope of what constitutes an "interest adverse to the child." *See Taylor*, 438 N.E.2d at 283–84; *Graham v. State*, 464 N.E.2d 1, 4 (Ind. 1984); *Whipple v. State*, 523 N.E.2d 1363, 1369–70 (Ind. 1988);

*Trowbridge v. State*, 717 N.E.2d 138, 147 (Ind. 1999). And we have never faced the precise inquiry presented here: whether and under what circumstances an adult's criminal conduct can render their interests adverse to a child.

J.Q.R. contends that the trial court abused its discretion by admitting the inculpatory statements he made during the custodial interrogations at his home and at the police station, asserting the State failed to prove Father had no interest adverse to J.Q.R. either time he waived J.Q.R.'s rights. J.Q.R. then maintains this error cannot be harmless because the statements were the only evidence showing he "knew or reasonably should have known that the pills were laced with fentanyl." The State disagrees on both points. It asserts that Father did not have an adverse interest because "[t]here was no evidence" he was not acting with J.Q.R.'s "best interests in mind." And it contends that any error in admitting J.Q.R.'s statements would be harmless.

We agree in part with both parties. Based on the plain text of the Juvenile Waiver Statute, we conclude that an adverse interest may arise if the evidence shows the adult stands to personally benefit from waiving the juvenile's rights to the juvenile's detriment. Here, at both moments J.Q.R.'s rights were waived, the police had uncovered evidence of Father's illegal drug activity. This evidence revealed Father had an interest in avoiding or mitigating police suspicion against him and thus could personally benefit from waiving J.Q.R.'s rights to J.Q.R.'s detriment. Given this evidence, the State failed to meet its burden to show Father did not have an adverse interest either time he waived J.Q.R.'s rights. And so, we hold that the trial court abused its discretion by admitting J.Q.R.'s inculpatory statements. But we conclude this error was harmless because its probable impact was minor in light of independent, unchallenged evidence establishing that J.Q.R. knew the pills contained fentanyl. Accordingly, we affirm.

# I. The trial court abused its discretion by admitting J.Q.R.'s inculpatory statements because the State failed to prove Father had no adverse interest.

We first determine whether and under what circumstances an adult's criminal conduct can render their interests adverse to a child by examining the text of the Juvenile Waiver Statute. Based on that text and plain-language definitions of relevant terms, we conclude that an adult may have an adverse interest if, at the time the adult waives the child's rights, the evidence shows the adult stands to personally benefit from waiving the child's rights to the child's detriment. This conclusion is also consistent with our caselaw applying the no-adverse-interest requirement. We then examine the facts here and conclude the State failed to prove beyond a reasonable doubt that Father had no interest adverse to J.Q.R. either time Father waived J.Q.R.'s rights.

## A. An adverse interest may arise if the evidence shows the adult stands to personally benefit from waiving the juvenile's rights to the juvenile's detriment.

To determine the meaning of the Juvenile Waiver Statute's requirement that an adult have "no interest adverse to the child," I.C. § 31-32-5-1(2)(B), we first look to the statute's text and give the terms their "plain and ordinary meaning," *Daniels v. FanDuel, Inc.*, 109 N.E.3d 390, 394 (Ind. 2018) (quotation omitted). Because the Legislature has not defined "interest" or "adverse," we turn to general-language dictionaries for guidance. *Smith v. State*, 232 N.E.3d 109, 115 (Ind. 2024). One such dictionary defines "interest" in relevant part as an "advantage" or "benefit." *Interest*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/interest (last visited Mar. 12, 2025). And "adverse" is defined as "acting against or in a contrary direction." *Adverse*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/adverse (last visited Mar. 12, 2025).

Consistent with these definitions, an adverse interest can arise when an adult is pitted against a child—such as when a caseworker who waived a juvenile's rights had initiated the delinquency proceedings against the juvenile and was employed by the "state agency" that "effectively assumed the role of an adverse party." *Borum v. State*, 434 N.E.2d 581, 584 (Ind. Ct. App. 1982); *see also Whipple*, 523 N.E.2d at 1370. But the definitions of these statutory terms also demonstrate that an adult can have an adverse interest if the evidence shows the adult stands to otherwise personally benefit from waiving the child's rights to the child's detriment.

This proposition is consistent with caselaw interpreting and applying the no-adverse-interest requirement, which we've recognized was designed to ensure that an "adult does not stand to benefit by cooperating with the police and encouraging the juvenile to act in a manner adverse to his interests." *Taylor*, 438 N.E.2d at 284. Aligned with this design, we've found no adverse interest based solely on evidence that a parent and their child's relationship was strained. *Id.* at 283–84; *Graham*, 464 N.E.2d at 4. We've also concluded that an adverse interest did not arise from a familial tie between an adult and the juvenile's alleged victims, *Whipple*, 523 N.E.2d at 1369–70, nor from a parent alerting police to their child's involvement in criminal activity, *Trowbridge*, 717 N.E.2d at 147; *see also M.R. v. State*, 605 N.E.2d 204, 207 (Ind. Ct. App. 1992). And our Court of Appeals has found no adverse interest when a mother waived her older son's rights despite both facing criminal liability for the death of the younger son. *N.B. v. State*, 971 N.E.2d 1247, 1254–55 (Ind. Ct. App. 2012), *trans. denied*. The mother was not a "key witness" against the older son, who confessed to shooting his brother, and she did not stand to personally benefit from his waiver because she faced neglect charges for the younger son's death regardless of what the older son told police. *Id.*

Each case above lacked evidence that the adult stood to personally benefit from waiving the juvenile's rights to the juvenile's detriment. But that may not be true if there is evidence of an adult's own criminal activity that produces an incentive in them to curry favor with police and avoid suspicion by encouraging a juvenile to waive their rights. *See Taylor*, 438 N.E.2d at 284 (explaining in dicta that a child's uncle who was also

arrested for the same crime "potentially would have held interests adverse to the juvenile"). In these circumstances, the adult may have a diminished ability to provide the equalizing force necessary to stave off the coercive environment of a custodial interrogation. *Cf. Hall*, 346 N.E.2d at 587 (recognizing that an adult's consultation with a juvenile is "meaningful" only "in the absence of the neutralizing pressures which result from police presence").

Determining whether an adult has an adverse interest is inherently a fact-specific inquiry that will turn on the totality of information available to police at the time of the waiver. *See Trowbridge*, 717 N.E.2d at 147. So to ensure the State "exercised adequate precaution" in accepting a waiver of a child's rights, *Taylor*, 438 N.E.2d at 284, we conclude trial courts must examine that information through the lens of a reasonable officer in determining whether the State proved beyond a reasonable doubt that an adult had no interest adverse to a child when the waiver occurred. With the proper analytical framework in hand, we now examine the evidence here to determine whether the record supports a conclusion that the State met its burden.

## B. The State failed to prove beyond a reasonable doubt that Father had no interest adverse to J.Q.R. either time J.Q.R.'s rights were waived.

Recall that J.Q.R. challenges the trial court's decision to admit as evidence his inculpatory statements to the detective at his home and at the police station. The basis for this challenge is J.Q.R.'s assertion that Father had an adverse interest because "[t]he record shows" he "stood to benefit by encouraging his son to cooperate with police" to J.Q.R.'s detriment. We agree and hold that, on this record, the State failed to meet its heavy burden to prove otherwise.

We reach this conclusion based on an examination of the totality of the circumstances confronting the detective at the time of each waiver. Before J.Q.R. spoke to the detective at the home, several police officers had arrived to execute a broad search warrant for, among other items, "any

and all" illegal drugs or drug paraphernalia. The officers were immediately greeted at the door by Father wearing a t-shirt with a message and imagery that glamorized drug use. Then, after gathering J.Q.R.'s family in the living room, the officers began the search and quickly found evidence that Father possessed illegal drugs—a bag of a white powdered substance in Father's wallet that the detective "believed . . . was going to be heroin." Given this sequence of events, the detective at that moment was on notice that Father had an incentive to avoid or mitigate police suspicion of his own drug possession. And thus a reasonable officer would have realized this incentive rendered Father's interests adverse to J.Q.R. Specifically, Father could personally benefit from waiving J.Q.R.'s *Miranda* rights and allowing J.Q.R. to speak with police to his detriment by focusing the detective on J.Q.R.'s wrongdoing rather than on Father's own criminal activities.

Father was also not the detective's only option, as J.Q.R.'s mother and paternal grandparents were sitting in the living room. But after finding the heroin in Father's wallet, the detective brought only Father and J.Q.R. into the kitchen to advise them of J.Q.R.'s rights and allow them to consult privately. Despite J.Q.R.'s mother's presence nearby, the detective testified that he never considered including her in these conversations. When, as here, police become aware that a parent has competing or diverging interests from their child, we urge them to consider the availability of other adults without such competing interests who can advise the child to ensure the parent with diverging interests cannot assume the role of interrogator. *See State in re A.S.*, 999 A.2d 1136, 1150 (N.J. 2010). As the detective failed to do so here, we find the State failed to prove that he "exercised adequate precaution" in accepting J.Q.R.'s first waiver. *Taylor*, 438 N.E.2d at 284.

We reach the same conclusion when examining the circumstances that arose between the first waiver and the second waiver later that night at the police station. After the first waiver, officers uncovered evidence in the home that implicated Father in additional criminal activity—a package with several boxes of THC vape cartridges addressed to Father and a ledger with a list of names and amounts owed totaling more than $9,000. Further, despite the initial evidence of Father's own drug possession in the

home, the detective allowed Father to assume the role of interrogator and participate in J.Q.R.'s questioning. Father continually asserted his innocence while encouraging J.Q.R. to confess to any wrongdoing. And after J.Q.R. told the detective that Father drove him to his classmate's home to sell the pills, Father prompted J.Q.R. to vouch for Father's innocence in that transaction. Most concerningly, Father's questions elicited some of J.Q.R.'s most incriminating statements, including his admission that the pills contained fentanyl. Based on these facts, a reasonable officer would have known at the time of the second waiver that Father had an even greater interest in avoiding or mitigating police suspicion against him and again could personally benefit from waiving J.Q.R.'s *Miranda* rights to J.Q.R.'s detriment.

As these conclusions are necessarily bound by the particular facts of this case, we decline to draw a bright-line rule that any evidence of an adult's criminal conduct will render their interests adverse to a child. *See N.B.*, 971 N.E.2d at 1254–55. Indeed, most parents have every capacity to safeguard their child's best interests when helping them decide whether to waive their rights. And we have no doubt that Father loves J.Q.R. But parental love alone does not negate evidence that a parent possesses an interest adverse to their child at the time the child's rights are waived. And when, as here, the evidence shows that a parent may be preoccupied with obscuring from police evidence of their own wrongdoing and thus might struggle to safeguard their child's best interests, officers must exercise caution in allowing the parent to waive their child's rights.

In summary, the facts and circumstances at the time of each waiver establish the State failed to show beyond a reasonable doubt that Father had no interest adverse to J.Q.R. either time he waived J.Q.R.'s rights. And thus, the trial court abused its discretion by admitting J.Q.R.'s inculpatory statements during the fact-finding hearing. We now assess the effect of this non-constitutional error to determine whether reversal is required.

## II. The error in admitting J.Q.R.'s statements was harmless.

When, as here, we must determine whether a non-constitutional error is harmless, "the party seeking relief bears the burden of demonstrating how, in light of all the evidence in the case, the error's probable impact undermines confidence in the outcome of the proceeding below." *Hayko v. State*, 211 N.E.3d 483, 492 (Ind. 2023). In arguing that reversal is required, J.Q.R. challenges only his adjudication for dealing in a controlled substance resulting in death. For that offense, the State had to prove he knowingly or intentionally delivered fentanyl-laced pills to R.J., this conduct caused R.J.'s death, and the death was reasonably foreseeable. *See* I.C. § 35-42-1-1.5(a); *Yeary v. State*, 186 N.E.3d 662, 673–74 (Ind. Ct. App. 2022). J.Q.R. maintains there was "no evidence" aside from his statements to the detective that he "knew or reasonably should have known that the pills were laced with fentanyl." But the record belies his assertion.

During the fact-finding hearing, the State entered into evidence text messages between J.Q.R. and Trevor Strickland, the adult who was later convicted of selling the pills to J.Q.R. In one message, sent about two weeks before J.Q.R. sold the pills to B.H. and R.J., J.Q.R. texted Strickland, "[T]hese fentanyl right?" Additionally, on the day of the pill sale, J.Q.R. texted Strickland asking, "[T]he blues aren't pharmacy scripted right?" Within a few seconds, before Strickland responded, J.Q.R. texted Strickland again informing him that "these hitters and got a phat tolerance." Consistent with this message, the State presented evidence that B.H. had texted Strickland about his "tolerance for fentanyl."

The above text messages provided the trial court with ample evidence that J.Q.R. knew the pills he sold to B.H. and R.J. contained fentanyl. We thus conclude J.Q.R. has failed to show that the likely impact of the court's error in admitting his statements, considering the evidence before the court, undermines confidence in his adjudication for dealing in a controlled substance resulting in death. As a result, we hold that the error was harmless.

# Conclusion

The State failed to meet its burden to show Father had no interest adverse to J.Q.R. at the times Father waived J.Q.R.'s rights and they spoke to a detective. We therefore hold that the trial court abused its discretion by admitting J.Q.R.'s inculpatory statements. But because we hold the error was harmless, we affirm.

Massa, Slaughter, Goff, and Molter, JJ., concur.

ATTORNEY FOR APPELLANT J.Q.R.
Zachary J. Stock
Zachary J. Stock, Attorney at Law, P.C.
Carmel, Indiana

ATTORNEYS FOR APPELLEE STATE OF INDIANA
Theodore E. Rokita
Attorney General of Indiana

Catherine E. Brizzi
Kelly A. Loy
Deputy Attorneys General
Indianapolis, Indiana