Dale A. WHIPPLE, Appellant (Defendant Below),

v.

STATE of Indiana, Appellee (Plaintiff Below).

No. 1185S496.

Supreme Court of Indiana.

June 8, 1988.

Charles A. Asher, Singer & Asher, South Bend, for appellant.

Linley E. Pearson, Atty. Gen., Gary Damon Secrest, Deputy Atty. Gen., Indianapolis, for appellee.

DICKSON, Justice.

Following a jury trial, defendant Dale A. Whipple was found guilty but mentally ill on two counts of murder, Ind.Code § 35–42–1–1, and was sentenced to concurrent terms of imprisonment of 40 years and 30 years. In this direct appeal, defendant raises five issues for review:

1. whether the trial court erred in refusing defendant's proposed self-defense instructions;

2. whether the trial court erred in admitting defendant's tape-recorded statements allegedly taken in violation of the defendant's Fifth Amendment rights and Indiana's juvenile waiver statute;

3. whether the trial court erred in overruling defendant's motion for bifurcated jury deliberations;

4. whether the trial court erred in refusing defendant's proposed instruction on involuntary manslaughter as a lesser included offense; and,

5. whether the trial court erred in refusing defendant's proposed instruction regarding the strict construction of criminal statutes.

The evidence suggests that throughout their respective lives, defendant and his younger sister were the victims of physical and mental abuse at the hands of their parents. In early or mid-December, 1984, defendant experienced a beating from his father for having candy bars in his room, and this appears to have at least contributed to defendant's decision to murder his parents. At some point later in December, the 17 year old defendant conferred with

his sister regarding the murder plan, and she apparently agreed to cooperate.

On the evening of January 1, 1985, the Whipple family returned home from visiting nearby relatives. Mr. Whipple went to bed. Defendant asked his mother to go with him to the garage on the pretext of looking at something outside the garage window. Once inside the garage, defendant killed his mother with several blows of an ax to her back and head. Defendant then proceeded to his parents' bedroom and killed his father with the same ax.

Defendant attempted to cover up his involvement by making it appear the house had been ransacked by outsiders. He discarded the ax and related items in a nearby lake. Defendant and his sister then drove to the home of Virginia Grove, a woman with whom defendant had been romantically involved. They stayed for a short time, then returned to the house where defendant pretended to "discover" his mother's body. Defendant and his sister left the house again and were stopped when defendant's erratic driving brought him to the attention of a South Bend police officer. Requesting the officer's help on grounds he believed his father had just killed his mother, defendant led the officer to the house and an investigation ensued.

During the days immediately following the killings, the investigation began to focus on defendant and his sister. On January 7, 1985, they agreed to be interviewed by police investigators. Defendant was interviewed twice. In his initial statement, defendant denied any involvement in the killings. During the second interview, defendant confessed to the killings.

### 1. Self-Defense Instructions

The defendant's first argument is predicated on the trial court's refusal to submit to the jury defendant's proposed instructions regarding self-defense and defense of others. The trial judge refused the tendered instructions on the ground said instructions were unsupported by the evidence.

Defendant's contention at trial was that his acts were those of self-preservation and defense of another, thus the killings constituted excusable homicide. The argument is premised on the contention that defendant and his sister lived in an ongoing atmosphere of imminent danger of serious bodily harm and fear of death. On appeal, he contends that, as a matter of law, the jury was entitled to pass on the question of self-defense, and thus argues the trial court erred in refusing the tendered instructions.

A claim of self-defense is predicated upon the right of every citizen to reasonably defend himself against unwarranted attack. *Jennings v. State* (1974), 262 Ind. 476, 318 N.E.2d 358. However, " '[t]he law of self defense is a law of necessity;' the right of self-defense arises only when the necessity begins, and equally ends with the necessity; and never must the necessity be greater than when the force employed defensively is deadly." *United States v. Peterson* (1973), D.C.Cir., 483 F.2d 1222, 1229, *cert. denied*, 414 U.S. 1007, 94 S.Ct. 367, 38 L.Ed.2d 244. This pervasive theme of necessity is manifest in our self-defense statute, Ind.Code § 35–41–3–2(a), which provides:

> A person is justified in using reasonable force against another person to protect himself or a third person from what he *reasonably* believes to be the *imminent* use of unlawful force. However, a person is justified in using deadly force *only* if he *reasonably* believes that that force is *necessary* to prevent serious bodily injury to himself or a third person or the commission of a forcible felony. No person in this state shall be placed in legal jeopardy of any kind whatsoever for protecting himself or his family by reasonable means necessary. [Emphasis supplied.]

The proper availability of defendant's self-defense instruction depends upon whether defendant reasonably believed both that he or his sister were facing an imminent use of unlawful force and that deadly force was necessary under the circumstances presented here. This question entails a dual inquiry: 1) whether defendant actually perceived a necessity to act as he did to

defend himself from an imminent threat; and 2) whether such perceptions were objectively reasonable. Even assuming, *arguendo*, that defendant honestly and in good faith believed the killings were necessary to prevent subsequent serious bodily injury from imminent use of unlawful force, we nevertheless find untenable the contention such subjective perceptions were *objectively* reasonable.

■ That defendant was a victim of an abusive or violent ongoing relationship does not, standing alone, support the giving of self-defense instructions. There must be a showing of imminent or impending danger. Proof that a danger is sufficiently imminent or impending to excuse the use of deadly force requires evidence that defendant, based upon prior experience or abuses, reasonably perceived imminent or impending danger closer in time to the use of deadly force than evident in the instant case. *Compare State v. Gallegos* (1986), App., 104 N.M. 247, 719 P.2d 1268 (defendant, who had experienced repeated physical abuse by husband, entitled to self-defense instruction in trial for killing her husband where husband, on day of killing, sexually abused defendant, struck child with a belt buckle, and threatened to kill defendant) *and People v. Scott* (1981), 97 Ill.App.3d 899, 53 Ill.Dec. 657, 424 N.E.2d 70 (defendant entitled to self-defense instruction following the killing of her husband after husband beat defendant with a pistol and fists and then gestured in such a manner that defendant, based on previous encounters, could have reasonably believed that husband was about to beat her again) *with Reed v. State* (1985), Ind., 479 N.E.2d 1248, 1253 ("[T]he evidence overwhelmingly shows that defendant shot his father and mother while both of them were sleeping. The evidence therefore did not support the giving of any self-defense instruction...."). *See also Hill v. State* (1986), Ind., 497 N.E.2d 1061 (affirming conviction of battered wife who continued to fire shots into her estranged husband although "he was no longer a threat when he fell to the ground"); *Jahnke v. State* (1984), Wyo., 682 P.2d 991 (affirming conviction of 16 year-old defendant for gunning down abusive father who, at time of killing, presented no present danger to the son); *State v. Leaphart* (1983), Tenn.Cr.App., 673 S.W.2d 870 (affirming conviction of battered wife for hiring killers to murder her husband who, at the time of his death, posed no imminent danger to wife).

■ We find that the absence of imminent or impending danger presented by the victims in this case, as evidenced by the remoteness in time between the murder of the victims and the last physical abuse inflicted upon either defendant or his sister, and by the fact the father was asleep and the mother was in a non-threatening disposition on the night of the killings, precludes the successful assertion of the defense of self or defense of others as a matter of law. The trial court's refusal of the instructions was proper.

We are cognizant of the tragedy experienced by the victims of battering relationships and all too frequent failure of social and law enforcement institutions to provide timely aid, comfort, and assistance to such victims. However, we are inescapably confronted here with conduct constituting the statutory offense of murder. The crimes cannot be condoned or excused on the basis of self-defense or defense of others.

### 2. Tape Recorded Statements

Defendant challenges the admissibility of the pre-trial recorded statements to police investigators based on the contention that the statements were taken in violation of his rights under the Fifth Amendment to the Constitution of the United States and Ind.Code § 31–6–7–3.

The undisputed facts relevant to this issue were contained in the trial judge's memorandum, which provided in part:

> Sandra and Wayne Whipple were found dead early on January 2, 1985. On that date, county police officers briefly interviewed the Whipples' children, Penny and Dale. When the officers asked Dale who should be contacted to take Penny and Dale home, Dale expressed concern for his grandparents, and an aunt was called.

Following further investigation, the officers requested interviews with Penny and Dale at the police station. The Whipple children arrived with their aunt and uncle, Pamela and Joseph Geirnaert, with whom the Whipple children had been living, and the children's grandparents, Ralph and Medrith Snyder.

Mr. Snyder had been busy during the days that followed the deaths of his daughter and son-in-law. He had dealt with the funerals and the estates, of which he was co-administrator. Mrs. Snyder was quite distraught. Mr. Snyder testified that Dale would never speak unless forced to, and would never resist instructions from an adult.

The police officers first interviewed Penny. Mr. Snyder was present during the interview, and Penny was given an opportunity to consult privately with Mr. Snyder before the questioning began.

After her interrogation was completed, Penny was sent to the lobby of the police station and Dale was summoned. Dale, Penny's older brother, was approximately six weeks short of his eighteenth birthday. Pamela Geirnaert, Dale's aunt, and Mr. Snyder, Dale's grandfather, were present. The police officers advised Dale, Mrs. Geirnaert and Mr. Snyder of the rights to remain silent, to the advice of counsel, to stop questioning at any time and to have counsel appointed. Mr. Snyder signed the waiver of rights as Dale's "guardian" and Dale signed the waiver of rights as the "juvenile"; Mrs. Geirnaert witnessed both signatures. Mr. Snyder had indicated to the police officers that he had an appointment that day with an attorney with reference to establishing a guardianship over Penny and Dale.

At 10:40, before the questioning began, the officers left the room to allow Dale an opportunity to consult with his grandfather. Mr. Snyder testified that during that consultation, he told Dale to tell the truth, that if Dale withheld anything he could get the death penalty or life imprisonment, and that if he cooperated, with psychiatric help Dale could get as little as five years. Mr. Snyder's advice concerning Dale's criminal exposure was based upon his own belief, rather than any statements by police. The officers returned to the room when advised the consultation was over. Neither Dale nor his family members indicated any question about their rights. The officers then questioned Dale, who denied any involvement in his parents' deaths, despite the officers' telling him that they believed he had killed his parents and that his denials were lies. The police officers conferred after the two-hour interrogation of Dale, and, due to some discrepancies between Penny's story and Dale's story, decided to re-interview the Whipple children. Penny was called back to the interview room first. Mrs. Geirnaert and Mr. Snyder were again present. As he did for each of the interviews, Mr. Snyder signed the warning and waiver form as "guardian." Mrs. Geirnaert signed as a witness. Penny was then re-interviewed and disclosed matters that she had not disclosed in her morning interview.

Penny then left the interview room with Mrs. Geirnaert, and Dale was recalled to the interview room. He and Mr. Snyder were again informed of their rights to counsel and against self-incrimination. The officers again left the room to allow Dale and Mr. Snyder to speak privately. Mr. Snyder told Dale of the discrepancies between Dale's morning statement and Penny's morning statement, and of the additional matters Penny had disclosed in her afternoon statement. He told Dale that Dale was in even more trouble because of Dale's first statement. He said that Dale could get the electric chair unless he confesssed [sic]. He told Dale that the family all loved Dale and wanted him to get psychiatric help. He said the family had been through enough.

The police officers re-entered the room when summoned. Dale and his grandfather were again informed of their rights to counsel and against self-incrimination; Mr. Snyder again signed as "guardian" and Dale again signed as "juvenile" on

the warning and waiver form. Dale gave his second statement.

Ind.Code § 31–6–7–3 provides in relevant part:

(a) Any rights guaranteed to the child under the Constitution of the United States, the Constitution of Indiana, or any other law may be waived only:

(1) by counsel retained or appointed to represent the child, if the child knowingly and voluntarily joins with the waiver; or

(2) by the child's custodial parent, guardian, custodian, or guardian ad litem if:

(A) That person knowingly and voluntarily waives the right;

(B) That person has no interest adverse to the child;

(C) Meaningful consultation has occurred between that person and the child; and

(D) The child knowingly and voluntarily joins with the waiver.

(b) The child may waive his right to meaningful consultation under subdivision (a)(2)(C) if he is informed of that right, if his waiver is made in the presence of his custodial parent, guardian, custodian, guardian ad litem, or attorney, and if the waiver is made knowingly and voluntarily.

Defendant contends: 1) Mr. Snyder did not qualify as a consulting adult under Ind.Code § 31–6–7–3(a)(2); 2) Snyder did not knowingly and voluntarily waive defendant's rights; 3) Snyder had interests adverse to defendant; 4) no meaningful consultation occurred between Snyder and defendant prior to the waiver; and 5) defendant did not knowingly and voluntarily join in the waiver of his rights.

■ Defendant argues that Snyder, defendant's grandfather, was not a qualified adult under Ind.Code § 31–6–7–3(a)(2) because he was not a "guardian, custodian or guardian ad litem" as those terms are defined in Ind.Code § 31–6–1–2.[1]

Although we are mindful that strict compliance with Ind.Code § 31–6–7–3 is necessary to safeguard the rights of juveniles, *Deckard v. State* (1981), Ind.App., 425 N.E. 2d 256, we have previously interpreted "guardian" to include *de facto* guardians acting *in loco parentis. See, e.g., Hall v. State* (1976), 264 Ind. 448, 346 N.E.2d 584 (sister acting *in loco parentis*); *Burnett v. State* (1978), 268 Ind. 618, 377 N.E.2d 1340 (sister); *Andrews v. State* (1982), Ind., 441 N.E.2d 194 (grandmother). This interpretation is sensible and complies with the spirit of the law and promotes the purpose of "afford[ing]" the juvenile defendant a stabilizing and relaxed atmosphere in which to make a serious decision that could possibly affect the rest of his life." *Andrews v. State*, 441 N.E.2d at 198. We find no error here.

■ The record clearly indicates Snyder was advised of defendant's *Miranda* rights, understood them, and voluntarily waived them. A written waiver of rights form was duly executed by Snyder and witnessed by defendant's aunt and the two interviewing police investigators prior to each of defendant's January 7, 1985, interviews. In addition, Snyder verbally acknowledged his understanding of the rights and the waiver of the rights at the beginning of each interview. In short, the record does not support defendant's contention of error on this point.

■ Defendant contends Snyder had "precisely the division of loyalties that the juvenile waiver statute is designed to avoid." Appellant's Reply Brief, p. 27. He supports this contention by pointing to Snyder's personal interest in discovering the truth surrounding the killing of his daughter and son-in-law, and suggests this conflicted with defendant's best interests. In addition, Snyder was acting as "guardian" for defendant's sister, whose interests were different than defendant's. Finally, defendant points to Snyder's financial in-

---

1. Under Ind.Code § 31–6–1–2, "custodian" means a person with whom a child resides; "guardian" means a person appointed by a court to have the care and custody of a child or his estate, or both; and "guardian ad litem" means a person appointed by a court to protect the interests of a child and to provide that child with services requested by the court.

terest in the victims' estates as adverse to defendant's under Ind.Code § 29-1-2-12.1.

As defendant points out, the record reveals that at all times relevant to this issue, Snyder was distraught over the killings and was burdened with making funeral arrangements and assisting in the representation of the victims' estates. However, we are unpersuaded that these factors undermined his capacity to safeguard defendant's best interests prior to and during the police interviews. As for Snyder's interest in discovering the truth, we considered a similar issue in *Buchanan v. State* (1978), 268 Ind. 503, 376 N.E.2d 1131, and held that because a consulting father was not acting in concert with the police, his advice to the defendant to waive his right to remain silent and to tell the truth did not render the waiver involuntary. *Cf. Borum v. State* (1982), Ind.App., 434 N.E.2d 581 (waiver invalid because child's guardian, a public welfare counselor, filed the petition initiating the proceeding and was also an employee of the state agency which assumed the role of an adverse party). Snyder was not acting as an agent for the police or prosecutor when he encouraged defendant to waive his rights and tell the truth. Snyder expressed his love and concern for defendant and his belief that if defendant told the whole story, he would be in a better position to receive psychiatric help and a more favorable sentence. We are unable to view his position as "adverse" as contemplated by the statute. We also agree with the trial judge's conclusion that Snyder's attempt to act as guardian for both defendant and his sister did not put Snyder into a position where his interest was adverse to defendant's.

■ With respect to the fact that Snyder's pecuniary interest in the victim's estate was adverse to defendant's pecuniary interest, we decline to view this as having any significant impact on Snyder's concern for defendant's best interests. Ind.Code § 29-1-2-12.1 provides in part that defend-

ant would be precluded from taking any property under his parents' wills or by intestate succession were he found guilty or guilty but mentally ill of the murders. Rather, defendant would hold the property as a constructive trustee for those individuals who would otherwise be entitled to the property. Thus, it appears *every* member of defendant's family had an interest similar to Snyder's. We agree with the observation of the trial judge:[2]

It would be preposterous to require investigating agencies to await the probating of the estate of a homicide victim before questioning a juvenile related to the victim. The problem could be avoided by appointment of a guardian ad litem or an attorney in all cases in which a juvenile is suspected of killing a relative. Such a solution would, however, disregard the purpose of the *Lewis [v. State* (1972), 259 Ind. 431, 288 N.E.2d 138] rule requiring the presence of a parent or guardian. That rule was intended to attempt to equalize the pressures borne by juveniles and adults during custodial interrogation by providing a 'familiar and friendly influence' at the time of the questioning. Providing a disinterested stranger would not achieve this goal.

■ There is no question that police investigators provided sufficient opportunity for defendant and Snyder to consult in private prior to both the first and second interviews. Snyder testified in the pre-trial suppression hearing that defendant said nothing in the periods set aside for these consultations, thus we would be unable to conclude any meaningful dialogue occurred. However, as observed in *Williams v. State* (1982), Ind., 433 N.E.2d 769, 772:

The "meaningful consultation" requirement consequently may be satisfied by either actual consultation of a meaningful nature or by the express opportunity for such consultation, which is then forsaken in the presence of the proper au-

---

**2.** While Ind.Code § 31-6-7-3 is essentially a codification of our holding in *Lewis v. State* (1972), 259 Ind. 431, 288 N.E.2d 138, it differs in one significant respect. We stated in *Lewis* that a child could by himself waive his constitutional

rights, while the Code prohibits unilateral waiver by the child. Instead, only counsel or the child's custodial parent, guardian, custodian, or guardian ad litem may waive the child's rights. *Sills v. State* (1984), Ind., 463 N.E.2d 228.

thority by the juvenile, so long as the juvenile knowingly and voluntarily waives his constitutional rights.

Defendant implicitly renounced his right to engage in any dialogue or to participate in any "meaningful consultation." The police had no control over defendant's use of the opportunity to consult, and they were in no position to dictate or even recommend how defendant and Snyder spend their time. *Buchanan v. State, supra.*

Ind.Code § 31–6–7–3(d) provides:

In determining whether any waiver of rights during custodial interrogation was made knowingly and voluntarily, the juvenile court shall consider all the circumstances of the waiver, including:

(1) The child's physical, mental, and emotional maturity;

(2) Whether the child or his parent, guardian, custodian, or attorney understood the consequences of his statements;

(3) Whether the child and his parent, guardian, or custodian had been informed of the delinquent act with which the child was charged or of which he was suspected;

(4) The length of time he was held in custody before consulting with his parent, guardian, or custodian;

(5) Whether there was any coercion, force, or inducement; and

(6) Whether the child and his parent, guardian, or custodian had been advised of the child's right to remain silent and to the appointment of counsel.

■ Defendant was six weeks shy of his eighteenth birthday and in good physical health. There is no question whether defendant and Snyder were advised of defendant's rights, and there is no contention that they did not understand. Defendant had not been held in custody prior to the opportunity to consult with Snyder in private. Defendant and Snyder were both aware of the acts of which defendant was suspected. Snyder urged defendant to waive his right to remain silent and tell the truth; however, we are unpersuaded that Snyder's influence upon defendant detracted from the voluntariness of defendant's waiver. When defendant firmly denied his participation in the crime during the first interview, the police investigators accused defendant of the killings and attempted to coax and persuade defendant to tell the whole story, but to no avail. The police also told defendant that if he was involved, he would receive "the proper help." We do not conclude, however, that these tactics constituted undue coercion or improper inducement to stimulate defendant's waiver or subsequent confession.

The transcripts of the interviews are devoid of any threats of force by police. Defendant was well aware he was the prime suspect in the case. The accusations during the course of the first interview were not made in such a manner so as to coerce an involuntary waiver or confession. Nor were the attempts to persuade defendant to tell the truth an improper inducement to render the subsequent confession involuntary. *See, e.g., Drew v. State* (1987), Ind., 503 N.E.2d 613, 615, and cases cited therein. Moreover, the statement that defendant would receive "the proper help" was insufficient to render the confession inadmissible. *Smith v. State* (1986), Ind., 500 N.E.2d 190, 193 ("An officer's statement to the accused during the interrogation that he will get mental health assistance for the accused does not constitute a promise of immunity or mitigation of punishment....."). *Accord Fennell v. State* (1986), Ind., 492 N.E.2d 297.

■ Defendant attempts to distinguish cases such as those cited above and advocates a dual standard by suggesting in the case of juveniles, any type of inducing tactic, no matter how minimal, undermines the voluntariness of the confession. We disagree. The paramount question regarding admissibility "is controlled by determining from the totality of circumstances whether or not the confession was given voluntarily and not through inducement, violence, threats or other improper influences so as to overcome the free will of the accused." *Massey v. State* (1985), Ind., 473 N.E.2d 146, 147. Any custodial interrogation may be viewed as a "coercive" or "threatening" method designed to induce a confession.

Our analysis requires that we look to the degree of the alleged inducement on a case-by-case basis and consider defendant's age as but a single factor in the totality of the circumstances. Our review here leads us to conclude beyond a reasonable doubt that defendant's waiver and confession were made knowingly and voluntarily.

### 3. Request For Bifurcated Jury Deliberations

■ Prior to trial, defendant provided notice of intent to present an insanity defense and then moved for bifurcated jury proceedings. Defendant proposed that in the first phase of the deliberations, the jury should determine whether defendant was guilty, guilty of a lesser included offense, not responsible by reason of insanity, or not guilty. It was proposed that if defendant was found guilty, the jury would reconvene to determine whether he was guilty but mentally ill. The trial court denied defendant's motion. In this appeal, defendant couches his allegation of error in terms of a denial of due process, contending that bifurcated submission of the issues to the jury was necessary to avoid a "confused, misinformed and compromised verdict." Defendant suggests the jury was under a misapprehension that a guilty but mentally ill verdict meant psychiatric treatment for defendant with little or no jail time.

We find that the trial court's ruling was not erroneous. In *Taylor v. State* (1982), Ind., 440 N.E.2d 1109, we rejected a similar constitutional challenge predicated on the contention that the terms "insanity" and "mental illness" were vague and susceptible to misinterpretation by persons of ordinary intelligence. The jury here was properly advised as to their role as fact finder and that sentencing was a responsibility vested solely in the court. The jury was properly instructed as to the elements of the crimes charged, the defense of insanity,

and the legal definitions of "mental illness" and "mental disease or defect."

### 4. Lesser Included Offense

Defendant contends the trial court erred in refusing to instruct the jury on the lesser included offense of involuntary manslaughter.

■ The test for determining whether an instruction on a lesser included offense should be given involves a two-step inquiry. We first determine whether the lesser offense is either inherently or factually included in the language of the statute and the document charging the greater offense.[3] *Roland v. State* (1986), Ind., 501 N.E.2d 1034; *Maynard v. State* (1986), Ind., 490 N.E.2d 762. If so, the analysis proceeds to step two:

> It [step two] is designed to determine if the evidence warrants an instruction on the lesser and included offense. Generally, that determination hinges on whether a serious evidentiary dispute exists with respect to the element which distinguishes the greater and lesser offense.

*Swafford v. State* (1981), Ind., 421 N.E.2d 596, 603 (citing *Roddy v. State* (1979), 182 Ind.App. 156, 394 N.E.2d 1098).

The State concedes the crime of involuntary manslaughter satisfies the first step, but argues the lesser included offense instruction was not warranted by the evidence. Defendant argues there was evidence from which the jury could conclude all of defendant's acts were involuntary because he had no "genuine choice as to his conduct."

■ The issue presented here must be distinguished from two closely related concepts. First, a person commits an offense only if he voluntarily engages in conduct in violation of the statute defining the offense. Ind.Code § 35–41–2–1. The jury was instructed on the voluntariness requirement, but declined to absolve defend-

---

**3.** We note that certain variances exist with respect to resolution of the first step of this two-step inquiry. *Compare Swafford v. State* (1981), Ind., 421 N.E.2d 596 *with Compton v. State* (1984), Ind., 465 N.E.2d 711 *and Sills v. State* (1984), Ind., 463 N.E.2d 228. *See also Brown v.* *State* (1987), Ind., 512 N.E.2d 173; *Roland v. State* (1986), Ind., 501 N.E.2d 1034. However, because of the State's concession as to step one, resolution of this conflict is inappropriate in the present case.

ant of criminal liability on this basis. Second, defendant's "lack of genuine choice" argument closely parallels a duress defense under Ind.Code § 35–41–3–8 which, by its terms, is not applicable to offenses against the person. *See Sanders v. State* (1984), Ind., 466 N.E.2d 424. The question here is whether the evidence could support a determination that the victims were killed while defendant committed or attempted to commit one of a number of crimes enumerated in Ind.Code § 35–42–1–4. The crime of involuntary manslaughter contemplates an incidental killing occurring during the commission or attempt to commit one of said enumerated crimes. The only other offense conceivably applicable to the facts here is battery. On the evidence presented, we find it inconceivable that the jury could find the victims were unintentionally killed while defendant battered them. The instruction was properly refused.

### 5. Strict Construction Instruction

Defendant argues the trial court erred by refusing to charge the jury with his tendered instruction number 1 regarding the strict construction of penal statutes and the necessity to resolve ambiguities in favor of the accused.

 To determine whether error resulted from the refusal of a tendered instruction, this Court must evaluate: 1) whether the tendered instruction correctly states the law; 2) whether there is evidence in the record which supports the tendered instruction; and 3) whether another instruction covered the substance of the tendered instruction. *Jackson v. State* (1986), Ind., 490 N.E.2d 1115.

There is no dispute that the tendered instruction correctly states the law in Indiana. However, we discern no ambiguity in the relevant statutes to warrant an instruction dictating that ambiguities should be resolved in favor of the accused. At trial, defendant suggested the instruction was relevant to construe the self-defense statute; however, as we have already held, the defense of self was not a valid defense under the facts of this case. Moreover, as the State points out, the jury was

adequately charged on the concept of reasonable doubt, defendant's presumption of innocence, the State's burden of proof, the lack of any proof burden on defendant, and the jury's right to determine the law. There was no prejudice to the defense as a result of the trial court's refusal of the tendered instruction.

### Conclusion

The judgment of the trial court is affirmed.

SHEPARD, C.J., and DeBRULER, GIVAN and PIVARNIK, JJ., concur.