


FILED

Aug 14 2025, 8:47 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

I N T H E

# Court of Appeals of Indiana

Dion Kimbrough,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

August 14, 2025

Court of Appeals Case No.
24A-CR-2348

Appeal from the Marion Superior Court

The Honorable Cynthia L. Oetjen, Judge

Trial Court Cause No.
49D30-2207-MR-19756

**Opinion by Judge Vaidik**
Judge DeBoer concurs.
Judge Bailey concurs with separate opinion.

**Vaidik, Judge.**

## Case Summary

[1] Dion Kimbrough was convicted of murder and Level 4 felony unlawful possession of a firearm by a serious violent felon for shooting a passenger on an Indianapolis interstate during a road-rage incident. He now appeals, arguing the trial court erred in admitting evidence that he was on home detention and GPS monitoring through community corrections at the time of the shooting. Finding the error harmless, we affirm.

## Facts and Procedural History

[2] Around 4:45 p.m. on July 18, 2022, Joshua Moore and his co-worker, Eli Hickerson, left work at M&K Truck Centers on the south side of Indianapolis. Joshua was driving his red Ford Focus, and Eli was in the front passenger seat. Both men lived in Hancock County and were commuting home for the day. Joshua had to pick up his son on the way home, so they planned to take I-465 East to I-70 East to the Mount Comfort Road exit. Joshua carried a handgun for protection. That day, he left his gun in the car during work. As they were driving home, Joshua's gun was "[i]n the middle of [him] and Eli . . . tucked down beside" his seat. Tr. Vol. II p. 152.

[3] At the same time, Kimbrough was returning from a job site in Columbus driving a box truck owned by his employer, W.E. Beaty Inc. The company's logo was on the truck. *See* Ex. 4. Kimbrough's co-workers, Bryan Peraza and Gustavo Angel Martinez-Martinez, were passengers. Bryan was seated in the

middle, and Angel was seated next to the passenger window. Kimbrough drove north on I-65 and merged onto I-465 East.

[4] According to Joshua, he was driving east in the far-left lane of I-465 as he approached the I-65 interchange. Joshua saw the box truck merge onto I-465, drive across several lanes, and nearly hit his Focus. The box truck settled into the lane to the right of the Focus but then sped ahead of the Focus and into its lane when traffic slowed down in the box truck's lane. Shortly after, the box truck tried to move back over to the right when traffic in that lane began to speed up. When it did so, the box truck pulled in front of a black Dodge pickup truck.

[5] The Focus kept driving in the far-left lane. Traffic picked back up in the Focus's lane, and it began to catch up to the box truck in the next lane over. When the Focus got next to the box truck, Eli "threw his hand out the [already open passenger] window and flipped [the box-truck driver] off." Tr. Vol. II p. 156. Traffic in the Focus's and the box truck's lanes continued to speed up and slow down and, at some point, the Dodge truck entered the Focus's lane. The Dodge truck then passed the box truck and threw a plastic cup from its sunroof, striking the box truck's driver's door and front window. The Focus then passed the box truck as traffic sped up in its lane. According to Joshua, Eli looked in the direction of the box-truck driver but didn't make any "hand gestures" this time. *Id.* at 161. Joshua then stopped paying attention to the box truck.

[6]     As the Focus moved over into the far-right lane of I-465 to merge onto I-70 East, the box truck "appeared out of nowhere" and was "right up on [the Focus's] bumper." *Id.* at 162. Once on I-70, the Focus was in the left lane, and the box truck was in the right lane. Joshua saw three people in the box truck. As the box truck passed the Focus on the right, Eli told Joshua that the driver had "waved" a gun at him. *Id.* at 166. Joshua and Eli decided to get the company's information from the box truck so they could call 911. As the box truck started slowing down to get off at the Post Road exit, the Focus passed it on the left, and Joshua leaned forward to "read numbers" from the truck. *Id.* at 168. At that point, Joshua saw the driver holding a gun and, "as quick as anything," the driver started shooting out the driver's window, which had been rolled down. *Id.* at 169. According to Joshua, the driver fired "[t]hree to five shots" at the Focus, shattering the rear passenger window. *Id.* Eli said, "I'm hit." *Id.* at 169-70. The box truck got off at Post Road, and Joshua stayed on I-70 to drive to an immediate-care facility he was familiar with at the next exit, Mount Comfort Road. Joshua called 911 at 5:21 p.m. and told the dispatcher that Eli had been shot, he thought he was dead, and he was heading to the medical facility on Mount Comfort Road. He also said that the box truck had the word "Beaty" on the side and that he "should have shot him back." *Id.* at 171; *see also* Ex. 127. Upon arrival at the medical facility, Joshua grabbed his gun, put it in his pocket, and ran inside to get help. Eli, however, had died. He had been shot once in the back, and the bullet traveled through his lungs and heart. The bullet was later recovered from his arm.

[7] Meanwhile, law enforcement started arriving at the medical facility. Joshua said he had a gun in his pocket, and they removed it. Joshua's gun, which was a 9mm, contained 10 bullets—9 in the magazine and 1 in the chamber. Since the shooting occurred on the interstate, the Indiana State Police took the lead in the investigation. Detective Brandon Alberts interviewed Joshua on the scene, and Joshua gave a description of the box truck and its driver. He also claimed that he never "displayed," "pointed," or "shot" his gun. Tr. Vol. II pp. 204-05. Police searched I-70 near the Post Road ramp and found two spent 9mm shell casings. The casings appeared to be new, and one appeared to have been run over.

[8] That evening, police went to the W.E. Beaty Inc. office to speak to one of the owners and observed the box truck that had been involved in the shooting. The box truck didn't have any bullet strikes or window damage. Based on what police learned, they suspected that Kimbrough was the box-truck driver and conducted surveillance of him that night. He split time between his house and his sister's house across the street.

[9] The next morning, Kimbrough drove to work with his girlfriend. Police arrested him upon arrival. Police obtained a search warrant for Kimbrough's house and car as well as his sister's house. Police found two 9mm guns, one at Kimbrough's sister's house and the other in his girlfriend's purse, which was in his car. A forensic firearms examiner later tested Joshua's gun, the gun found at Kimbrough's sister's house, and the gun found in Kimbrough's girlfriend's purse. Joshua's gun and the gun found at Kimbrough's sister's house were

excluded as having fired the shots, and the gun found in Kimbrough's girlfriend's purse could not be identified or excluded as having fired the shots.

[10] The State charged Kimbrough with murder and Level 4 felony unlawful possession of a firearm by a serious violent felon (based on his 2019 conviction for Level 3 felony conspiracy to commit armed robbery). Before trial, defense counsel filed a motion in limine seeking to prohibit admission of evidence that Kimbrough was on "home detention/GPS" for his 2019 conviction at the time of the shooting because it would violate Indiana Evidence Rules 404(b) and 403. Appellant's App. Vol. II p. 217. The parties had the following discussion on this issue:

> **[THE STATE]:** Yes, Judge. I think it's relevant evidence. We have community corrections witnesses to state that the defendant, based on his GPS bracelet, was near or at the location of the shooting at that time. In addition to that, it was a key piece of evidence that the Indiana State Police developed early on in the investigation to identify the defendant as a suspect. It's really no different than cellphone records, Judge, and the only difference is that it's a GPS. We're not gonna get into why he was on GPS, the -- the conviction related to GPS. It's just the fact that he was on electronic monitoring and then those records support his identity as the State disclosed in its 404(b) motion. Even though it's not really [a] prior bad act, it's just similar to cellphone records, it's just in a different capacity. It's a GPS -- or an electronic monitoring bracelet.
>
> **THE COURT:** Response . . . .
>
> **[DEFENSE COUNSEL]:** Yes, Judge. Judge, the fact that he was on home detention, the fact that he was on GPS while he

was serving his sentenc[e] for robbery is prohibited by 404(b). Judge, what I think the State is trying to do quite frankly is backdoor the fact that he had been serving a sentence for an offense. The State will have witnesses, Judge, that will clearly place Mr. Kimbrough at the scene of the shooting as well [as] on 65 and 465. Specifically, Judge, in the boxtruck, along with Mr. Kimbrough, was Bryan Peraza and Angel Martinez. Both of those are State's witnesses. They will testify that they were in the boxtruck, at least I expect them to, they were in the boxtruck when they left the . . . work site they happen[ed] to be working at, Judge, and then they rode in the boxtruck from the work site all the way back to the office of [W.E. Beaty Inc.], Judge. And so their testimony's clear that Mr. Kimbrough was the driver of the vehicle and they laid out . . . more or less the route that was taken. Also, as you have an opportunity to listen to the testimony of Joseph Quiroga, Judge, he also testified that Mr. Kimbrough was the driver of that boxtruck and he also testified about the route that was expected to have been taken on that date. I was going to cite the testimony as to [Stephen] Beaty, but they've already told us -- they just told us that they weren't go[ing] to be calling [him]. Also, Judge, . . . the boxtruck that was being driven by Mr. Kimbrough also had a GPS system, Judge. So really, any -- any evidence or testimony about this home detention or GPS is really just cumulative. They have more than enough testimony and evidence to show what his route was and that he in fact was on I-65, 465, and I-70.

**THE COURT:** Response, sir?

**[THE STATE]:** Judge, there was no GPS working at the time of this in the truck. Additionally, the case law's pretty clear -- I tried to find a case where someone objected to this type of evidence coming in to -- in trial and I just couldn't find any because they talk about this type of evidence in trial because it's just admissible. I mean, that's all there is to it. As long as we take the precaution not to address what type of crime it's related to, I

couldn't find a case where the issue was brought before the Court of Appeals. Maybe there's one out there that I couldn't find, but every case that I find, they were talking about once it being admitted and then something else irrelevant as to the actual admissibility of it. So, Judge, I think the case law pretty well supports that this is admissible evidence. We're not using it to do anything. It's . . . our evidence, we feel as though it's . . . indicative of . . . his identity. Yes, we have witnesses. However, this is two years ago this offense happened, we can't guarantee that the witnesses on the stand are gonna be able to identify the defendant today in court. We don't know that. Hopefully they will, maybe they won't. But if that doesn't happen, and . . . Defense is gonna cross-examine those same witnesses to attack their credibility -- this evidence is gonna corroborate any type of testimony that is prevented via live witness testimony and . . . the State feels that it's admissible evidence.

**THE COURT:** All right, I'm gonna --

**[DEFENSE COUNSEL]:** Judge, may I respond to the --

**THE COURT:** Sure.

**[DEFENSE COUNSEL]:** -- ID portion of his argument?

**THE COURT:** Yes.

**[DEFENSE COUNSEL]:** Judge, he said that they're not sure if their witnesses are gonna be able to ID the [defendant]. And, Judge, based on depositions that have been taken, based upon statements that have been given to the detectives in this case, it is clear that Bryan Peraza who was in the boxtruck along with Angel Martinez, both identified Mr. Kimbrough as having shot the gun in the direction of the red car. And so, Judge, I don't

think ID is an issue at all. Again, I believe it is cumulative. I also
. . . think it's prejudicial under 403, Judge.

Tr. Vol. II pp. 20-23. The trial court denied Kimbrough's motion in limine on this issue.

[11]  A bifurcated jury trial was held due to the serious-violent-felon charge. During opening statements, defense counsel acknowledged that Kimbrough was driving the box truck that day. *See id.* at 134. Counsel claimed that someone in the red car "pointed [a] gun at [Kimbrough]" and that the case was "all about self-defense" and road rage from Joshua and Eli. *Id.* at 139.

[12]  Joshua testified as detailed above but couldn't identify Kimbrough as the driver of the box truck. He also testified that his gun remained "in between [him] and [Eli] in the seat" during the entire incident and that he "never" removed it, even when the box-truck driver displayed his gun. *Id.* at 157, 164, 171, 173, 176, 200. Joshua acknowledged that he might have told police and his friend on the day of the shooting that his gun was in his glove box. However, he said he was probably "confused" from the stress and that his gun was between the seats. *Id.* at 176. Joshua explained that his gun could hold 11 bullets if he put 10 in the magazine, loaded 1 in the chamber, and then took the magazine out to add the 11th. He said, however, that he had 10 bullets in his gun that day—9 in the magazine and 1 in the chamber.

[13]  On cross-examination, Joshua acknowledged that he might have told his wife after the incident, "I wish I didn't have [my gun] on me, to be honest with

you." *Id.* at 204. He also admitted that he might have pointed his gun at the box truck after Eli was shot:

Q. But you met with both Detective Allen and Detective Alberts on August 8th of '22; is that right?

A. I don't remember the date, but I did meet with Detective Alberts and Detective Allen.

Q. It'd be about 20 days later; is that right?

A. Yes, sir.

Q. And at that time, you told the detectives that you may have pulled that gun and --

A. Yes --

Q. -- pointed it at them; is that right?

A. I recall telling them that anything's possible after somebody shoots at you and your life is threatened, that is possible that that did happen.

Q. Well, did you say, "And did I grab it, point it at him? It's very possible. I don't remember"?

A. Yes, I did say that 'cause I don't remember everything that happened that day at that moment.

Q. So you may have, it's very possible you pointed it at the boxtruck but you just don't remember?

A. **If I did, it was after he had shot at my car and killed my friend.**

*Id.* at 205-06 (emphasis added).

[14] Angel, who had been seated on the passenger side of the box truck next to the window, testified that Kimbrough was driving the box truck that day and was speeding. He explained that while they were on I-465, "a red car had some issue" with Kimbrough. *Id.* at 221. Kimbrough, who was "[a]ngry" and "upset," then retrieved a gun from his backpack and fired it twice through the driver's window. *Id.* Angel didn't "hear anyone else shoot a weapon." *Id.* at 223. After Kimbrough fired the shots, Angel saw a car with "[b]roken windows" drive past them. *Id.* After they returned to the W.E. Beaty Inc. office, Kimbrough signaled for him "[t]o be quiet" by placing his index finger on his lips. *Id.* at 226. On cross-examination, Angel acknowledged that from his position in the box truck, he couldn't see whether the occupants of the red car had a gun or pointed a gun at Kimbrough. *Id.* at 235.

[15] Bryan, who had been seated in the middle of the box truck, also testified that Kimbrough was driving the box truck that day. He said he saw two men in a red car and that the man in the passenger seat "flipp[ed] [them] off." *Id.* at 247. He testified that after the driver of the black truck threw a cup at them, Kimbrough "sped up," and they caught up to the red car. *Id.* at 249. At that point, Kimbrough "reached into his backpack and started shooting" through the driver's window. *Id.* at 250. Bryan said Kimbrough fired three shots and that he

didn't hear "any other shots" "before or after" Kimbrough fired his gun. Tr. Vol. III p. 2. Bryan acknowledged that just before the shooting, he couldn't see the hands of the driver or the passenger in the red car. *Id.* at 12-13. But he maintained that no one shot at them and that after Kimbrough fired his gun, neither the driver nor the passenger in the red car had a gun. *Id.* at 13-14.

[16] Detective Alberts testified that on the day of the shooting, Kimbrough was "being monitored on GPS." *Id.* at 40. Defense counsel made a continuing objection to the GPS evidence, which the trial court noted. Detective Alberts, who never testified why Kimbrough was being monitored, stated that the GPS records placed Kimbrough "at or near the shooting at the time that it was reported." *Id.* at 40-41.

[17] Later in the trial, before the State planned to call two community-corrections employees to talk about Kimbrough being on GPS monitoring at the time of the shooting, defense counsel asked the trial court to revisit the motion in limine on this issue. The following exchange occurred:

> **[DEFENSE COUNSEL]:** Thank you, Judge. So our objection on this, as the Court is aware, is that it violates Indiana Rule of Evidence 404. And the Court found that it . . . was probative to the State's case. And so our response to that was, it would be cumulative because at the point where the evidence would be admitted, there would already be sufficient testimony that would serve the purpose that the State is seeking for that particular evidence. So we've confirmed with the State, and I don't think they would dispute this, and if they did, they can -- if they do, they can, but our belief is the purpose of that evidence is to put Mr. Kimbrough in the location at the time. Up to this point,

there doesn't appear to be a real dispute in the evidence about Mr. Kimbrough's presence at that location. We have not challenged his identity in any way. We have not challenged his presence at that location. In fact, we have asked questions of all of the State's appropriate witnesses about how they put him there. The State has gotten into evidence through Detective Alberts that he was on electronic monitoring, that his electronic monitoring tracked him to those appropriate locations at the times in question. Mr. Peraza has testified that he was in the vehicle at that location at the time shots were fired. Mr. Martinez has testified that he was in that vehicle at that location at the time shots were fired. Mr. Moore has identified him as the person at that location at the time shots were fired. Mr[.] Joseph Quiroga has testified that he was assigned to that particular truck; that particular vehicle on that particular day, he would have been in the truck with those individuals. So at this point to introduce evidence in the form of two Marion County Community Corrections employees to talk about how the defendant is under their supervision, the Court supervision, on GPS monitoring for some reason unknown to this jury is highly prejudicial and not significantly probative in light of the evidence that's been presented thus far.

**THE COURT:** Response, State?

**[THE STATE]:** Judge, just one correction, Joshua Moore did not identify Mr. Kimbrough. He could not identify him. So that's not accurate. But, yes, they all did that. However, it's been brought up with the detective on the stand questioning his investigation, you know, talking about GPS records for cellphones and all that. In addition to that, Defense can't dictate what evidence the State wants to present to prove identity in this case. Identity is a major element in this case. **Unless they stipulate that Dion Kimbrough is the person that fired that weapon at Eli Hickerson on Interstate 70 and we file that stipulation in front of the Court and we read that stipulation,**

**then I believe that we do need to do that because they're gonna question, and they already have, questioned the veracity of every witness that has identified Dion Kimbrough as the shooter.** Therefore, the State feels as though it needs to corroborate their testimony, those witnesses to place the defendant there at the time of the shooting, and this is a prime piece of evidence to do that because this is part of the essential investigation that Detective Alberts made when he identified the defendant initially as a suspect. He obtained . . . these records, these specific records to place him at the scene of the. [sic]

**THE COURT:** [Defense counsel], are you going to in any way in a closing dispute that he was in that vehicle at that time?

**[DEFENSE COUNSEL]:** No, Judge, I'm not. But I -- I do wanna be clear about some point. [The State] indicated that he had that question and that concern based on the Defense's position that it's inappropriate . . . for the State to say in a closing argument that we concede anything that's not stipulated to. So I can tell this Court and the State in good faith, we don't intend to ever say that Dion Kimbrough was not in that boxtruck that day at the time those shots were fired, **but we're not – we're not conceding any element the State has to prove either.** But it's not our intention to suggest – we've done nothing to do that up until this point.

*Id.* at 158-160 (emphases added). The State said that unless Kimbrough stipulated he was shooter, it felt it "need[ed] to present as much evidence as it can to support that." *Id.* at 160. Defense counsel responded:

Judge, I just wanna make the point in response to the State's last position. In no way does the fact that he was on GPS monitoring in that vehicle prove that he was the shooter. It simply proves he was in the vehicle. They have to prove the identity of the person

that's charged with murder. We are not conceding murder, not now, not ever.

*Id.* at 161. The trial court ruled that it was going to "continue to deny that motion in limine by the Defense" and that the State would be "allowed to talk about the GPS and home detention" so long as it didn't say "why" Kimbrough was on home detention, i.e., for his 2019 conviction for Level 3 felony conspiracy to commit armed robbery. *Id.* at 160.

[18] Two community-corrections employees then testified. Specifically, Logan Smith testified that she worked for Marion County Community Corrections as a supervisor, and Kyle Vancura testified that he was Kimbrough's case manager at Marion County Community Corrections. Both testified that Kimbrough was on home detention on July 18, 2022, and subject to GPS monitoring by Marion County Community Corrections. Over defense counsel's objection, Exhibit 129R, Kimbrough's Community Corrections Client Information Sheet containing his gallery number, and Exhibit 130, which showed Kimbrough's GPS locations between 4:05 p.m. and 5:59 p.m. on the day of the shooting, were admitted into evidence.

[19] Kimbrough didn't testify in support of his self-defense claim, but the jury was given several instructions on self-defense. *See* Appellant's App. Vol. III pp. 35-39. During closing arguments, defense counsel argued that the State failed to prove a "knowing killing" and failed to rebut Kimbrough's self-defense claim. Tr. Vol. III p. 225. Counsel asserted that the Focus was "chasing" Kimbrough and therefore Kimbrough "didn't willingly enter into a fight" or have a "duty to

retaliate." *Id.* at 225, 231, 241. Counsel didn't explicitly acknowledge or dispute that Kimbrough fired his gun but implied that Joshua pointed his gun or fired first:

> If [Kimbrough] feared serious bodily injury -- and you'll receive the definition -- serious permanent disfigurement, extreme pain, a car accident -- if he feared reasonably a forcible felony, and that includes the threat of force, having a firearm out is the threat of force -- he does not have to wait to be hurt. He does not have to wait to be shot, because our law says no person in this state should be penalized for defending themselves. The threat alone is enough.

*Id.* at 241. Counsel also argued that Joshua wasn't credible given his varying accounts of where his gun was located and his acknowledgment that he may have pointed his gun at the box truck. Finally, counsel emphasized that Joshua's gun could hold one more bullet than it had.

[20] The jury deliberated for approximately 9 hours before finding Kimbrough guilty of murder and that he knowingly or intentionally possessed a firearm. After the second phase of trial, the jury found that Kimbrough was a serious violent felon and that he committed Level 4 felony unlawful possession of a firearm by a serious violent felon. The trial court sentenced him to sixty years.

[21] Kimbrough now appeals.

## Discussion and Decision

[22] Kimbrough contends that the trial court erred in admitting evidence that he was on home detention and GPS monitoring through community corrections at the

time of the shooting. We review the admission of evidence for an abuse of discretion. *Hall v. State*, 177 N.E.3d 1183, 1193 (Ind. 2021).

[23]   Kimbrough argues that "[t]he testimony of [Detective] Alberts, Logan [Smith], and [Kyle] Vancura, and State's Exhibits 129R and 130, were admitted in violation of Evidence Rule 404(b)." Appellant's Br. p. 19. Evidence Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but it "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." When a trial court assesses the admissibility of 404(b) evidence, it must (1) determine whether the evidence of a crime, wrong, or other act is relevant to a matter at issue other than the defendant's propensity to commit the charged act and (2) balance the probative value of the evidence against its prejudicial effect under Evidence Rule 403. *Nicholson v. State*, 963 N.E.2d 1096, 1100 (Ind. 2012); *Fairbanks v. State*, 119 N.E.3d 564, 568 (Ind. 2019). Evidence Rule 403 provides, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence."

[24]   Here, we agree with the State that the evidence was relevant to a matter at issue other than Kimbrough's propensity to commit the crime. That is, the evidence showed Kimbrough's location at the time of the shooting, which helped to

prove that he was the shooter. *See* Appellee's Br. p. 16 ("The GPS location evidence tied [Joshua's] testimony to [Angel's] and [Bryan's] testimony and helped to prove Kimbrough's identity as the person who shot at [Joshua's] Focus."); *Geise v. State*, No. 22A-CR-2461, 213 N.E.3d 1038, *6 (Ind. Ct. App. June 8, 2023) (mem.) (noting that the defendant's "status on home detention placed him at the home when S.G. was injured" and was thus relevant under 404(b)), *trans. denied*.

[25] We therefore proceed to the second step: whether the probative value of the evidence was substantially outweighed by the danger of unfair prejudice under Evidence Rule 403. This is a much closer call. Kimbrough claims that the probative value is low, as he "never disputed that [he] was driving the box truck from which the shots were fired." Appellant's Br. p. 12. Indeed, both Angel and Bryan testified that Kimbrough was driving the box truck, and defense counsel acknowledged as much during opening and closing. Kimbrough also points out that the GPS evidence didn't establish that he was the shooter, only that he was in the area. We agree that the probative value of this evidence was low.

[26] Balanced against this is the prejudice to Kimbrough from the jury knowing that he was on home detention and GPS monitoring through Marion County Community Corrections at the time of the shooting. Kimbrough argues:

> [T]his evidence made it blatantly obvious that Kimbrough was under the supervision of a court. The average juror would recognize that a person is not placed on home detention, placed on GPS monitoring, and subject to supervision by a court and community corrections, for no reason. The average juror would

likely infer that Kimbrough was in the community corrections program because he was convicted of a crime. . . . In addition, as defense counsel noted [at trial], if any of the jurors were familiar with gallery numbers, they would also know that Kimbrough had been in the Department of Correction[] (DOC).

*Id.* at 19 (citations omitted).

[27] The State responds that the trial court attempted to minimize the risk of prejudice to Kimbrough by not allowing the State to present evidence about why he was on home detention and GPS monitoring through community corrections, i.e., his 2019 conviction for Level 3 felony conspiracy to commit armed robbery. In support, the State cites *Rasnick v. State*, 2 N.E.3d 17 (Ind. Ct. App. 2013), *trans. denied*, but that case is distinguishable. There, the defendant, who was charged with burglary for stealing items from a dorm room at Hanover College, "was on parole for a previous burglary conviction and was being monitored by Scott County Community Corrections via a GPS tracking bracelet on his ankle." *Id.* at 20. The defendant filed a motion in limine seeking to prohibit admission of evidence that he was subject to GPS monitoring by community corrections at the time of the burglary. The court allowed the State to present GPS evidence of the defendant's movements on the day of the burglary, but several precautions were taken:

> Before presentation of the evidence, the parties stipulated that the jury would neither be advised that [the defendant] was on GPS monitoring because he was a parolee, nor that he was being monitored by Scott County Community Corrections at the time of the burglary. When questioning the witness who testified as to

the GPS information, the State was careful not to elicit any testimony as to the witness's place of employment [Scott County Community Corrections], the fact that [the defendant] was on parole, or [the defendant's] prior convictions. The jury was not informed that the method of monitoring was a tracking bracelet.

*Id.* at 26 (footnote omitted).

On appeal, the defendant argued that the trial court erred in admitting the GPS evidence under Evidence Rule 403:

> Specifically, [the defendant] argues the "prejudicial value of the GPS evidence far outweighed any probative value" because the "mere fact that he was on GPS" likely "created speculation by the jury as to why he was being monitored." He contends that the GPS evidence contained "minimal probative value" because "[t]he fact that [he], according to GPS, was at Hanover College in and of itself does not prove he participated in any crime."

*Id.* at 25-26. We found that the trial court did not abuse its discretion in admitting the evidence:

> Here, the GPS data was probative because it provided objective evidence as to [the defendant's] locations and movements during the precise period of time in which the crime occurred. The data placed [the defendant] at both the scene of the burglary and at the scene of the arrest. Furthermore, any improper prejudicial effect was limited very effectively at trial by the court. . . . Given the care taken by the trial court to minimize speculation by the jury as to the purpose of the GPS monitoring, we conclude that the probative value of the GPS data substantially outweighs any potential prejudicial effect.

*Id.* at 26.

Here, although Detective Alberts didn't testify that Kimbrough was on home detention or community corrections, the trial court allowed two additional witnesses to testify that Kimbrough was on home detention and GPS monitoring through community corrections at the time of the shooting, and those witnesses also testified that they worked at Marion County Community Corrections. The court also allowed the admission of Exhibit 129R, which was Kimbrough's Community Corrections Client Information Sheet containing his gallery number. The prejudice here was much higher than in *Rasnick*. And as already explained, the probative value was low given that Kimbrough acknowledged he was driving the box truck at the time of the shooting. The trial court abused its discretion in admitting the evidence.

But the error was harmless. When an appellate court determines whether a non-constitutional error was harmless, Indiana Appellate Rule 66(A)'s "probable impact test" controls. *Hayko v. State*, 211 N.E.3d 483, 492 (Ind. 2023), *reh'g denied*, *cert. denied*. "Under this test, the party seeking relief bears the burden of demonstrating how, in light of all the evidence in the case, the error's probable impact undermines confidence in the outcome of the proceeding below." *Id.* This is not a review for the sufficiency of the remaining evidence; rather, it is a review of what was presented to the jury compared to what should have been presented. *Id.* "And when conducting that review, we consider the likely impact of the improperly admitted or excluded evidence on a reasonable, average jury in light of all the evidence in the case." *Id.* "[T]he error's probable impact is

sufficiently minor when—considering the entire record—our confidence in the outcome is not undermined." *Id.*

[31]     Our confidence in the outcome is not undermined here. As noted above, the jury was not told why Kimbrough was on home detention and GPS monitoring through community corrections. Had the jury been told that Kimbrough was on home detention for his 2019 conviction for Level 3 felony conspiracy to commit armed robbery, we would rule differently. But the jury also heard evidence that Kimbrough had a full-time job and was moving about in society. *See Geise*, 213 N.E.3d 1038, *6 ("Home detention is usually ordered for low-level offenders, and the jury heard evidence that, despite his home detention commitment, [the defendant] was working full-time to support his family."). The jury likely concluded that Kimbrough was on home detention for a low-level offense.[1]

[32]     In addition, there was substantial independent evidence of Kimbrough's guilt apart from the home detention/GPS evidence. Joshua testified that the box-truck driver, who had been driving erratically, fired multiple shots at his Focus and that he didn't have his gun in his hand before the box-truck driver started shooting. Joshua testified multiple times that his gun remained between him and Eli in the seat and that **if** he displayed his gun, it was only **after** the box-

---

[1] Kimbrough notes that the jury asked the following question during deliberations, "Under the law governing GPS monitoring, can an individual be allowed to carry a weapon?" Tr. Vol. IV p. 5. Kimbrough claims that this question shows that "the jury was affected by the community corrections evidence." Appellant's Br. p. 25. Although we can't speculate as to what the jury was thinking, it appears, as the parties and the trial court discussed below, that this question was directed toward whether Kimbrough knowingly or intentionally possessed a firearm. *See* Tr. Vol. IV p. 5.

truck driver fired at them. Moreover, Kimbrough's own passengers, Angel and Bryan, testified that Kimbrough removed his gun from his backpack and shot at the red car. While the defense implied that Joshua fired his gun because there were 10 bullets in it—and not 11—Joshua testified that it only had 10 to begin with. And although Angel and Bryan couldn't see everything going on in the red car before the shooting, neither heard any other shots being fired. In addition, after returning to the W.E. Beaty Inc. office, Kimbrough signaled for Angel to be quiet, reflecting Kimbrough's awareness of the fact that the shooting was not justified.

[33] Although Kimbrough argued self-defense to the jury, his defense wasn't particularly strong. Notably, he doesn't argue on appeal that the State failed to rebut his self-defense claim. And while defense counsel acknowledged below that Kimbrough was driving the box truck, counsel also argued that the killing was not knowing and wouldn't stipulate that Kimbrough fired the shots, telling the trial court, "We are not conceding murder, not now, not ever." For the above reasons, we find that the admission of the evidence was harmless and therefore affirm the trial court.

[34] Affirmed.


DeBoer, J., concurs.
Bailey, J., concurs with separate opinion.

ATTORNEY FOR APPELLANT

Lisa Johnson
Brownsburg, Indiana


ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General

Steven J. Hosler
Deputy Attorney General
Indianapolis, Indiana

**Bailey, Judge, concurring.**

I agree with my colleagues' determination that the trial court's admission of the home detention/GPS evidence was harmless error. I write separately to suggest that rarely, if ever, would a valid self-defense claim be available in a road rage situation like the one before us in this case.

The self-defense statute, Indiana Code Section 35-41-3-2, reads in pertinent part as follows:

> (c) A person is justified in using reasonable force against any other person to protect the person or a third person from what the person reasonably believes to be the imminent use of unlawful force. However, a person:
>
> (1) is justified in using deadly force; and
>
> (2) does not have a duty to retreat;
>
> if the person reasonably believes that that force is necessary to prevent serious bodily injury to the person or a third person or the commission of a forcible felony. No person, employer, or estate of a person in this state shall be placed in legal jeopardy of any kind whatsoever for protecting the person or a third person by reasonable means necessary.

At trial, there was nothing but speculation to support a finding that Kimbrough reasonably believed that Joshua and/or Eli were about to use unlawful force

against him and/or his coworkers and that deadly force was necessary to prevent serious bodily injury.[2]

[37] Our Supreme Court has stated that "the law of self defense is a law of necessity; the right of self-defense arises only when the necessity begins, and equally ends with the necessity; and never must be the necessity be greater than when the force employed defensively is deadly." *Whipple v. State*, 523 N.E.2d 1363, 1366 (Ind. 1988) (alteration and quotation marks omitted) (quoting *United States v. Peterson*, 483 F.2d 1222, 1229 (D.C. Cir. 1973), *cert. denied*). In almost any conceivable road rage situation, a motorist who feels threatened by another motorist (or passenger) could slow down, speed up, change lanes, turn onto another road, or take other evasive action to avoid being subjected to the use of unlawful force. Thus, it would almost never be necessary (or reasonable) to use deadly force in a road rage scenario. I think most Hoosiers would agree that a self-defense claim should not be available to someone who fires a weapon from one moving vehicle toward another moving vehicle in rush hour interstate traffic, which could result in tragic consequences for innocent third parties.

---

[2] The deputy prosecutor stated as much during the final instruction conference. *See* Tr. Vol. 3 at 201 ("I think it's unfortunate the jury has the actual law of self-defense, but I don't think, there's any substantive evidence in the record to actually support it."). Ultimately, the deputy prosecutor did not object to the giving of a self-defense instruction because she did not "want the jury to be confused as to what the actual law is." *Id*. If the prosecutor had objected, the trial court would have been well within its discretion to refuse the instruction.